1

RONALD M. GRASSI,
SALLY M. GRASSI

2

P. O. Box 6961
Tahoe City, CA 96145

3

Telephone:  (530) 583-3105
Email:  ronsallygrassi@mac.com

4

5

Plaintiffs, In Pro Per

6

7

UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

9

RONALD M. GRASSI and
SALLY GRASSI,

Case No.:  CV-00543-JAM-DAD

10

11

Plaintiffs,

**PLAINTIFFS' (1)  OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS and (2) REQUEST FOR
LIMITED DISCOVERY**

- vs -

12

MOODY'S INVESTOR'S SERVICES,
STANDARD AND POOR'S FITCH
RATINGS,

**Date:  July 31, 2009
Time:  10 a.m.
Dept:  Courtroom 27
Before:  Magistrate Judge Dale A. Drozd**

13

14

Defendants.

15

16

Plaintiffs oppose Defendants' motion to dismiss their complaint based upon the

17

matters set forth in their Opposition to said motion, the Declaration of Ronald M. Grassi filed

18

herewith, all pleadings and papers on file in this action, oral argument at the subject hearing,

19

and any other matter which either may be submitted at the hearing or of which the Plaintiffs

20

may request the Court to take judicial notice.  This (one) Opposition addresses the 3 Motions

21

to Dismiss filed by the Defendants on June 15, 2009.  Plaintiffs also request the right to pursue

22

limited discovery to address certain questions of fact and evidence that relate directly to

23

Defendants' defenses

24

25

**INTRODUCTION**

26

Defendants focus solely on technical legal issues, as is appropriate with a Motion to

27

Dismiss, in their attempt to deny Plaintiffs their day in court.  Their position is that even if a

28

wrong has been committed, they will, and the law should, do everything possible to insure

1

there will be no remedy.  As far as Plaintiffs can tell, this action may be the first action filed by individual investors against the 3 rating companies (the Defendants herein) in, at least, California, if not the nation, since the country's economic "downturn" began in about 2007. What this Court decides today will likely have a major impact on subsequent similar litigation and will either redress a major wrong that has adversely affected millions of investors and the country's economic health, or the Court may choose to accept all the defenses raised by the Defendants and, in essence, validate their wrongful conduct.  Plaintiffs and many economic experts (some of which are quoted herein and will later be called to testify at trial if given the opportunity) contend that the 3 rating companies, known as "The Gatekeepers," were one of the most, if not the most, guilty parties causing the real estate collapse which began in about 2007, and which, in turn, led to the stock market collapse in 2008-2009, causing the loss of billions of dollars of investments held in pension funds all over America, as well as by local, county and state governments in funds being held for the payment of government expenses, teacher salaries, etc.  In order to appreciate the immensity of this catastrophe and the court's frankly awesome responsibility, a brief background may be helpful.

Before about  the year 2000, most home  loans were conventional and their performance predictable.  Most of these loans involved detailed credit checks and 20% down. This fairly prudent and long-standing lending procedure allowed rating companies to predict the risk of  a mortgage default. Then something major happened:  Would-be borrowers were allowed, in fact, encouraged, to put less down than the conventional 20%; often 10% then finally nothing done. Other borrowers were allowed to receive loans with little income verification, and often, no income verification, and finally no income at all.  When the appraisals were made, they often were insufficient to justify the loan, but with pressure from the realtors and lenders, the appraisers got the message and appraised the subject property high enough to justify the loan.  If the interest rate was too high, the would-be borrower was steered to an adjustable mortgage, offering an initial low starting rate, and no one worried about what would happen a few short years later when the loan dramatically  adjusted to a more realistic

rate, unfortunately beyond the borrowers' capability.  And, if that weren't enough, there were teaser rates, non-disclosure of key information such as a borrower's poor prior credit history, recent/current unemployment, and so on.  Surprisingly, lenders made these loans which we'll call sub-prime loans, but there were also other names, like toxic loans, liar's mortgages, Alt-A mortgages, unconventional loans, etc.  Still, to this point, this was not the perfect storm.  Why?  Because normally these loans should not, and generally could not,  have been sold, as there should have been no buyers.  Freddy Mac and Fannie Mae would not generally buy these loans, paying the proceeds back to the bank so that more of these unconventional loans could be offered with plenty of profit to go around.  No, generally there had to be a market for these toxic loans but the conventional market knew better.  What was needed was (1) a **secondary** market (2) that was **not regulated** and (3) **the participation of the rating agencies**.  Even with a secondary market nothing much could happen unless these toxic loans could be sold.  Fortunately for the real estate industry, there was a secondary market that was potentially available to help, and fortunately the Government did not regulate this field.  All that was needed was a credible method to sell  these loans and that's where the Gatekeepers became involved.  How?

The investment banks, including Lehmans and dozens of others, hit upon the idea of packaging these worthless time bombs into investment securities to be called "asset backed securities" (i.e., the "asset" being the worthless mortgage).  Still, who would buy these investments if they were apprised of the underlying toxicity?  Very few if any investors indeed.  So one more ingredient was needed:  credibility.  And this is where the Gatekeepers entered the picture and made billions of dollars, being paid by the very banks they were rating!  They crossed the line in their duty to the public and SOLD their valuable ratings to the investment banks for hundreds of thousands of dollars.  Once the public saw an AAA rating from one or more of these defendants on a bond, backed by a few to several thousand mortgages, the investing public jumped aboard.  **Had the Gatekeepers refused to sell themselves and their credibility and their ratings to legitimize these toxic loans, there**

3

**would have been no secondary market, and without a secondary market, the subprime loans would never have created the perfect storm for the country's subsequent real estate collapse, followed by the economic collapse.**

Roger Lowenstein, a writer for the <u>New York Times</u>, wrote an article on April 27, 2009 entitled: "Triple-A Failure," and a portion of his somewhat lengthy article is herein set forth:

> In 1996, Thomas Friedman, the New York Times columnist, remarked on "The NewsHour With <u>Jim Lehrer</u>" that there were two superpowers in the world — the United States and <u>Moody's</u> bond-rating service — and it was sometimes unclear which was more powerful. Moody's was then a private company that rated corporate bonds, but it was, already, spreading its wings into the exotic business of rating securities backed by pools of residential mortgages.

> Obscure and dry-seeming as it was, this business offered a certain magic. The magic consisted of turning risky mortgages into investments that would be suitable for investors who would know nothing about the underlying loans. To get why this is impressive, you have to think about all that determines whether a mortgage is safe. Who owns the property? What is his or her income? Bundle hundreds of mortgages into a single security and the questions multiply; no investor could begin to answer them. **But suppose the security had a rating. If it were rated triple-A by a firm like Moody's, then the investor could forget about the underlying mortgages. He wouldn't need to know what properties were in the pool, only that the pool was triple-A — it was just as safe, in theory, as other triple-A securities.**

> Over the last decade, Moody's and its two principal competitors, Standard & Poor's and Fitch, played this game to perfection — putting what amounted to gold seals on mortgage securities that investors swept up with increasing élan. For the rating agencies, this business was extremely lucrative. Their profits surged, Moody's in particular: it went public, saw its stock increase sixfold and its earnings grow by 900 percent.

> By providing the mortgage industry with an entree to Wall Street, the agencies also transformed what had been among the sleepiest corners of finance. **No longer did mortgage banks have to wait 10 or 20 or 30 years to get their money back from homeowners. Now they sold their loans into securitized pools and — their capital thus replenished — wrote new loans at a much quicker pace.**

> Mortgage volume surged; in 2006, it topped $2.5 trillion. Also, many more mortgages were issued to risky subprime borrowers. Almost all of those subprime loans ended up in securitized pools; indeed, the reason banks were willing to issue so many risky loans is that they could fob them off on Wall Street.

> But who was evaluating these securities? Who was passing judgment on the

4

quality of the mortgages, on the equity behind them and on myriad other investment considerations?  Certainly not the investors.  They relied on a credit rating.

**Thus the agencies became the de facto watchdog over the mortgage industry.**  In a practical sense, it was Moody's and Standard & Poor's that set the credit standards that determined which loans Wall Street could repackage and, ultimately, which borrowers would qualify.  Effectively, they did the job that was expected of banks and government regulators.  And today, they are a central culprit in the mortgage bust, in which the total loss has been projected at $250 billion and possibly much more.  ....

It should be noted here, and it is discussed below, that these so-called expert analysts of debt risk did not generally, if ever, have the individual loan files before them, nor did they communicate with the borrowers to verify the information they provided in their loan applications.  Why would this be the case?  Because the Gate Keepers viewed themselves as infallible statisticians, able to superimpose on thousands of borrowers their computer business models developed before the flood of subprime loans and yet come up with the likelihood of default of these borrowers for which they had little empirical evidence.  And when their own analysts suggested that updated models were desperately needed, they were told to rate the securities without updated models (see below).

Frank Partnoy, a professor at the University of San Diego School of Law has written extensively about the Gatekeepers and has concluded that thanks to the Gatekeepers close relationship with the banks, they behaved less like gate keepers and more like gate openers (see below).

It gets worse, as Lowenstein points out while discussing a proposed security he was studying with the help of a Moody's analyst:

The loans in Subprime XYZ were issued in early spring 2006 — what would turn out to be the peak of the boom.  They were originated by a West Coast company that Moody's identified as a "nonbank lender."  Traditionally, people have gotten their mortgages from banks, but in recent years, new types of lenders peddling sexier products grabbed an increasing share of the market.  This particular lender took the loans it made to a New York investment bank; the bank designed an investment vehicle and brought the package to Moody's.

Moody's assigned an analyst to evaluate the package, subject to review by a committee.  The investment bank provided an enormous spreadsheet chock with data on the borrowers' credit histories and much else that might, at very least, have given Moody's pause.  Three-quarters of the borrowers had adjustable-rate mortgages, or ARMs — "teaser" loans on which the interest rate could be raised in short order.  Since subprime borrowers cannot afford higher rates, they would need to refinance soon.  This is a classic sign of a bubble — lending on the belief, or the hope, that new money will bail out the old.

Moody's learned that almost half of these borrowers — 43 percent — did not provide written verification of their incomes.  The data also showed that 12 percent of the mortgages were for properties in Southern California, including a half-percent in a single ZIP code, in Riverside.  That suggested a

5

risky degree of concentration.

On the plus side, Moody's noted, 94 percent of those borrowers with adjustable-rate loans said their mortgages were for primary residences. "That was a comfort feeling," Robinson said. Historically, people have been slow to abandon their primary homes. When you get into a crunch, she added, "You'll give up your ski chalet first."

Another factor giving Moody's comfort was that all of the ARM loans in the pool were first mortgages (as distinct from, say, home-equity loans). Nearly half of the borrowers, however, took out a simultaneous second loan. Most often, their two loans added up to all of their property's presumed resale value, which meant the borrowers had not a cent of equity.

In the frenetic, deal-happy climate of 2006, the Moody's analyst had only a single day to process the credit data from the bank. The analyst wasn't evaluating the mortgages but, rather, the bonds issued by the investment vehicle created to house them. A so-called special-purpose vehicle — a ghost corporation with no people or furniture and no assets either until the deal was struck — would purchase the mortgages. Thereafter, monthly payments from the homeowners would go to the S.P.V. The S.P.V. would finance itself by selling bonds. The question for Moody's was whether the inflow of mortgage checks would cover the outgoing payments to bondholders. From the investment bank's point of view, the key to the deal was obtaining a triple-A rating — without which the deal wouldn't be profitable. That a vehicle backed by subprime mortgages could borrow at triple-A rates seems like a trick of finance….

The secret sauce is that the S.P.V. would float 12 classes of bonds, from triple-A to a lowly Ba1. The highest-rated bonds would have first priority on the cash received from mortgage holders until they were fully paid, then the next tier of bonds, then the next and so on. The bonds at the bottom of the pile got the highest interest rate, but if homeowners defaulted, they would absorb the first losses.

It was this segregation of payments that protected the bonds at the top of the structure and enabled Moody's to classify them as triple-A. Imagine a seaside condo beset by flooding: just as the penthouse will not get wet until the lower floors are thoroughly soaked, so the triple-A bonds would not lose a dime unless the lower credits were wiped out….

Structured finance, of which this deal is typical, is both clever and useful; in the housing industry it has greatly expanded the pool of credit. But in extreme conditions, it can fail. The old-fashioned corner banker used his instincts, as well as his pencil, to apportion credit; modern finance is formulaic. However elegant its models, forecasting the behavior of 2,393 mortgage holders is an uncertain business. "Everyone assumed the credit agencies knew what they were doing," says Joseph Mason, a credit expert at Drexel University. "A structural engineer can predict what load a steel support will bear; in financial engineering we can't predict as well."

Mortgage-backed securities like those in Subprime XYZ were not the terminus of the great mortgage machine. They were, in fact, building blocks for even more esoteric vehicles known as collateralized debt obligations, or C.D.O.'s. C.D.O.'s were financed with similar ladders of bonds, from triple-A on down, and the credit-rating agencies' role was just as central. The difference is that

6

XYZ was a first-order derivative — its assets included real mortgages owned by actual homeowners.  C.D.O.'s were a step removed — instead of buying mortgages, they bought bonds that were *backed* by mortgages, like the bonds issued by Subprime XYZ.  (It is painful to consider, but there were also third-order instruments, known as C.D.O.'s squared, which bought bonds issued by other C.D.O.'s.)

Miscalculations that were damaging at the level of Subprime XYZ were devastating at the C.D.O. level.  Just as bad weather will cause more serious delays to travelers with multiple flights, so, if the underlying mortgage bonds were misrated, the trouble was compounded in the case of the C.D.O.'s that purchased them.

Moody's used statistical models to assess C.D.O.'s; it relied on historical patterns of default.  This assumed that the past would remain relevant in an era in which the mortgage industry was morphing into a wildly speculative business.  The complexity of C.D.O.'s undermined the process as well.  Jamie Dimon, the chief executive of JPMorgan Chase, which recently scooped up the mortally wounded Bear Stearns, says, "There was a large failure of common sense" by rating agencies and also by banks like his.  "Very complex securities shouldn't have been rated as if they were easy-to-value bonds."

So, with the existence of a secondary market, no regulation, and very willing credit rating agencies being paid hundreds of thousands of dollars by the very companies they were rating, is it any wonder that a real estate bubble developed and grew and was just waiting to pop.  The proverbial pin that would pop the bubble had already been created: when the sub-prime adjustable rate mortgages came up for adjustment, thousands of  foreseeable defaults began to occur.  Why weren't the Gatekeepers doing their job of honest analysis and down-grading when necessary?  Where were these Gatekeepers when the Country needed them?

**The Gatekeepers are now in Courtroom 27.**

## STANDARD OF REVIEW

A.   **Plaintiffs' complaint was and is properly drafted in conformity with the State of California Rules of Procedure and the use of the Judicial Council's Approved Forms.  However, if more detailed pleadings are now required, Plaintiffs request leave to amend**, as motions to dismiss are disfavored and Plaintiffs can and will, if so required, re-plead more specifically.

The following procedural holdings appear in almost every Court's decision pertaining

7

to a Rule 12(b)6 motion:

[HN2]In ruling upon a motion to dismiss an action for securities fraud, courts must accept the complaint's allegations as true, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007), and draw all reasonable inferences in the plaintiff's favor, Caiola v. Citibank, N.A., 295 F.3d 312, 321 (2d Cir. 2002). The court only "assess[es] the legal feasibility of the complaint," it does not "assay the weight of the evidence which might be offered in support thereof." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003) (citations omitted).

[HN3]In addition to the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, 493 F.3d at 98. Courts may also consider matters subject to judicial notice. Tellabs, 127 S.Ct. at 2509 [**16] (citation omitted).

IN THIS RESPECT, PLAINTIFFS ASK THE COURT TO TAKE JUDICIAL NOTICE OF THE SEVERAL EXHIBITS ATTACHED TO THE DECLARATION OF RONALD GRASSI WHICH EXHIBITS REFLECT THE TESTIMONY OF THE PARTICIPANTS AT THE CONGRESSIONAL HEARING HELD ON OCT. 22, 2008.

( See Rutter Group Practice Guide, Federal Rules of Civil Procedure Before Trial; Schwarzer et al, P. 9:212.15: "Matters subject to judicial notice")

[N3]The federal rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief." [*249] Fed. R. Civ. P. 8(a). The Rule 8 standard contains "a powerful presumption against rejecting pleadings for failure to state a claim." Auster Oil & Gas, Inc. v. Stream, 764 F.2d 381, 386 (5th Cir. 1985); see also Hall v. City of Santa Barbara, 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that 'the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted'") (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice [**8] & Procedure § 1357, at 598 (1969)).

The Supreme Court has explained that "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). [HN4]In reviewing the sufficiency of a complaint, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* In particular, the Court has stated that the FHA must be given a "generous construction" to carry out a "policy that Congress considered to be of the highest priority." Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209-12, 34 L. Ed. 2d 415, 93 S. Ct. 364 (1972) (noting that private suits are "the primary method of obtaining compliance with the Act"). Moreover, the Court recently rejected the concept of a "heightened pleading standard" for civil rights cases and concluded that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993). See Gilligan v. Jamco Develop. Corp (9th Cir. 1997) 108 F3d 246, 249.

See also Bennett v. Schmidt (7th Cir. 1998) 153 F3d 516, 518 stating that: Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving — if the claim is unclear, by requiring a more definite statement under Rule 12(e), and if the claim is clear but implausible, by inviting a motion for summary judgment.

See also Rule 15 and dozens of cases confirming a plaintiff's right to amend, if necessary, especially if the subject motion to dismiss is the first such motion filed.

**B.    Plaintiffs contend that their state claims are still properly pled, even if they are to be decided by a Federal court.**

As Defendants have filed a 12(b)(6) motion, their and the Court's attention is directed to the admonition contained in Federal Civil Procedure Before Trial, Rutter Group, at

9

(4) 9:215 at  Page 9-68 as follows:  "In reviewing a 12(b)(6) motion, the court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them" (several citations omitted).  This rule does not exclude State claims.

**C.      Plaintiffs cannot plead all facts one might demand until they are permitted to proceed with limited discovery.**

Following the Remand hearing on  May 1, 2009, the Court  decided the next step was for the Defendants to file their motions to dismiss.  Accordingly, even though Plaintiffs filed their complaint in State court over one-half year ago, no formal discovery has occurred. Especially with actions like this, where many witnesses are thousands of miles away, where the identity of many are unknown at this point, and only a few helpful documents are only recently being made public by, for example, (a) the U.S. Congress (see Ronald Grassi declaration) and (b) certain tangent lawsuits involving these very same Defendants, it should be recognized that the substantial specificity demanded by the Defendants may have to await the completion of the discovery phase of this case.  But many of the facts that are available are set forth herein.

**D.      Plaintiffs request limited discovery at this time if greater specificity is required by the Court.**

If the Court is inclined to require more specific facts and evidence pled, then Plaintiffs urge the Court to permit some limited discovery at this time including:

(1)      the depositions of the 3 CEOs of the rating companies

(2)      the depositions of the 3 analysts who reviewed the information available on the Plaintiffs' bonds before recommending their respective ratings

(3)      a set of tailored interrogatories

(4)     a request for key records should be sent to each Defendant; Plaintiffs have a right to inquire into certain issues that otherwise they could not possibly know with respect to these particular bonds, including but not limited to, ALL documents between each Defendant and Lehman Bros. pertaining to the Plaintiffs' bonds and any structuring or restructuring advise or participation in said structuring or restructuring of said bonds

(5)     an interrogatory to determine if and how the Defendants participated in the structuring of these bonds

(6)     what specific documents were placed before the analysts in their review process of Plaintiffs' bonds.

(7)     what specific documents did the analysts see which they felt justified the rating given to each of Plaintiffs' bonds

(8)     how much was each rating agency paid in total for each of their ratings

(9)     whether, and to what extent, rating shopping occurred in the discussions between Lehmans and the rating agencies

(10)     the names of the analysts described in the declaration of Ronald Grassi, in particular those who wrote the emails submitted to the H.R. Committee on Oversight and Government Reform, 110th Cong. (Oct. 22, 2008) ("Congressional Hearing")

(11)     why the Defendants failed to downgrade the subject bonds months earlier than waiting until the issuer (Lehmans) went into bankruptcy

(12)     when and how the computer models for risk evaluation were updated by

11

each Defendant to account for the subprime loans being made in 2000-2005

Accordingly , if the Court is concerned, at this early stage, with the presentation of specific facts over and above those offered herein, then Plaintiffs request a Court order permitting limited discovery by Plaintiffs at this time.

**E.      THE CLAIMS, AS PLED, SATISFY CALIFORNIA LAW BUT IF THE MORE DETAILED FEDERAL PLEADING REQUIREMENTS ARE REQUIRED, PLAINTIFFS CAN AND WILL COMPLY**

The Plaintiffs filed their complaint in the State of California by using the Judicial Council's approved pleading forms.  Plaintiffs did not intend their pleadings to conform to Federal rules, nor New York's rules, etc.  This Court has determined, over Plaintiffs' objections and Motion for Remand,  to hear Plaintiffs' State claim in a Federal court.  It does not necessarily follow that Plaintiffs now have to change their claims nor how they are pled.

Plaintiffs' common law negligence and fraud claims have not been pre-empted by Federal law, nor should the Court construe preemption when in doubt.  As pointed out in National Century Fin. Enters, et al., 580 F Supp 2d 630:  "HN18The presumption is that Congress does not intend to preempt state law."   **[\*\*64]** See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654-655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995) ("Despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law").

The only relevant case, thus far, that Plaintiffs can find which touches upon the issue of a state court litigant using a California Judicial Council form to plead negligence, and its holding, is set forth in full herein:

Plaintiff, proceeding in pro se, commenced this action on September 5, 2006 in the Superior Court of California, County of San Diego.  [*2]  The form complaint was drafted using Judicial Council of California Form 982.1.  The complaint generally indicates that she brings this action against Defendant for general negligence as she suffered loss of use of property and general damages. (Compl. at p.3). On September 22, 2006 Defendants removed the action to this court.

DISCUSSION

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Dismissal of a complaint is also appropriate if the complaint is "vague, conclusory, and general and does not set forth any material facts in support of the allegations." North Star Int'l v. Arizona Corp. Com'n, 720 F.2d 578, 583 (9th Cir. 1983).  While pro se complaints are construed liberally, litigants are not excused from complying with basic pleading rules of the Federal Rules of Civil Procedure. See King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987).

The present complaint is too vague and conclusory to provide Defendants with adequate notice of the claims asserted against them.  The complaint does not identify the legal claim with sufficient clarity such that Defendants [*3]  can conduct discovery or prepare a defense to the claim.  The complaint does not allege medical negligence, only general negligence.  Further, the complaint does not identify any individual involved in the complained of conduct or even allege the date of her injury.  Absent such minimal allegations, Defendants cannot be expected to adequately defend against the complaint.  Accordingly, the court grants the motion to dismiss under Rule 8(a), and instructs Plaintiff to file an amended complaint within twenty days of entry of this order." Haskins-Green v. Naval Med. Ctr. San Diego, 2007 U.S. Dist. LEXIS 9469, 2-3 (S.D. Cal. Feb. 8, 2007)

Plaintiffs, in the current case, does plead sufficient facts to apprise Defendants of what constitutes the specific negligence/fraud, when same occurred, and with what result.  Further the precise bonds are described and the method of misrepresentation is set forth, at least sufficient for demurrer purposes in California.

Plaintiffs have met the "Haskins" burden of pleading by identifying who they are, what they purchased, that they relied, that the Defendants were either negligent or guilty of fraud,

13

and their damages.

**I.      DUTY OWED BY DEFENDANTS TO PLAINTIFFS**

    **A., B.  ALL THREE RATING AGENCIES OWED PLAINTIFFS, AS MEMBERS OF THE TARGETED AND LIMITED GROUP OF BOND INVESTORS AND AS <u>THIRD-PARTY BENEFICIARIES</u>, A <u>DUTY</u> TO HONESTLY AND EXPERTLY EXAMINE AND RATE THESE COMPLEX BONDS**

        **1.  CALIFORNIA LAW SHOULD APPLY AS CALIFORNIA HAS MORE RELEVANT CONTACTS**

There is more reason to apply California law to this case, than that of New York. This is so because the Plaintiffs purchased the Lehman bonds in California, after receiving notice of the ratings in California, Plaintiffs were injured in California, the misrepresentations (i.e., the tort) were received in California, the Plaintiffs' broker, who also relied on the ratings was, and is, in California, and the reliance by Plaintiffs occurred in California. Further, Defendants should be estopped from seeking any protection in their home state as the foreseeable damage and victims were and are in each state. The criteria for selecting the appropriate choice of law is explained in the <u>Restatement 2nd</u> re: Conflicts of Laws as follows:

    § 145 The General Principle

    **(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.**

    **(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:**

    **(a) the place where the injury occurred,**

    **(b) the place where the conduct causing the injury occurred,**

    **(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and**

    **(d) the place where the relationship, if any, between the parties is centered.**

    **These contacts are to be evaluated according to their relative importance with respect to the particular issue.**

14

The <u>Ultramares Corp. v. Touche</u> 174 N.E. 441 (N.Y. 1931) does not mandate protection for New York domiciled corporations in all cases, a point Defendants concede by attempting to satisfy California's criteria.  In either event, as Plaintiffs contend they are in privity with the Defendants, for the reasons discussed below and elsewhere in this brief, this matter should not be an issue.

### 2.     THE RELATIONSHIP BETWEEN PLAINTIFFS AND DEFENDANTS

Defendants argue, at P. 20-21 of the S & P brief, and elsewhere, that:  "In fact, the Complaint does not include a single allegation of **any** interaction or <u>relationship</u> between any of the rating Agencies and either of the Plaintiffs.  (emphasis added by Plaintiffs).  First of all, if the Court so determines, Plaintiffs can and will amend their complaint and specifically allege a relationship.  More to the point however, is for the Court to understand why there is a relationship between the rating companies and the Plaintiffs and what that relationship is.

Unlike the several cases cited by the Defendants involving, for example, a professional evaluating a financial statement **for** a specific client, or a lawyer drafting a document **for** a client, etc., here the rating agencies publish a rating aimed solely AT the bond-investing public to encourage them to buy a bond which they more likely than not helped structure.  These Defendants advise most bond investors in the United States.  They evaluate the credit risk and publish their view in the form of a rating for the investors to see and rely upon.

Put differently, the issuer (who's paying for the rating) and the rating agency could care less about the rating as it pertains to the value or financial health of the offering.  Each already knows its toxic value.  No, their real concern is to reach out to the investing public and convince them to buy the bond they've rated.  Hence, the rating is **for** the investing public, and that is the limited group described that provides the privity allowing plaintiffs to proceed.

15

The rating agency and the issuer know that the high fees paid by the issuer to the rating agency are only of value to the issuer if it can sell the bond to the investing public.  What sells the bond is obviously not the toxic nature of the bond, nor the arcane description of the bond in the 80-100–page Prospectus.  No, it's only one factor:  the rating.

The rating is of such immense value because of 2 factors:  (1) great marketing by the rating agencies over the past 40+ years convincing the investing public that the rating agencies are professionals, that they carefully examine each bond to assess its risk, they're honest and objective, and therefore the investing public can rely on their alleged due diligence (see each Defendant's website attesting to their integrity, thoroughness, and independence; and in this review note how each avoids mention of their by now famous conflict of interest due to their being paid by the same entity whose bond they are rating)  (2) The Prospectus is both too lengthy and too complex for a mere mortal investor and his broker to attempt to comprehend the analysis.  And even if the average investor or broker could wade through and understand a 100-page prospectus, it would not be practical:  the investor may be looking and deciding among 3-10 bonds and reading that many prospectuses is unreasonable when one considers that there are 3 rating agencies out there which have already supposedly done all the necessary work and even posted for all the world to see a report-card like rating.

Further, even if the investor and broker were to read all these bonds (surely a Herculean task if done professionally), the evidence will show that the documents underlying the investment vehicle (i.e., the mortgages backing the mortgage-backed securities) are not there! They never were as explained in the Lowenstein article (infra).

It has been the standard of practice for years therefore when reviewing bond choices, to ask:  what is the bond's rating and by whom??  **Accordingly the ONLY target of the rating, the only relationship that matters,  is the relationship with the target: the**

**investing public.** For this reason a duty of care arises, and the investing public expects from the rating agencies is that the rating be accurate, the result of an honest, professional and objective analysis by experts. In fact, that's pretty much what the websites of these rating agencies state. Moody's website, for example is at: http://www.moodys.com/moodys/cust/AboutMoodys/AboutMoodys.aspx?topic=intro&redir_url=/cust/AboutMoodys/staticRedirect.asp.

This website describes how its service helps the investor understand the risk of fixed income investments. Is that so? Without repeating what's been said above, how can what Moody's and the other agencies did be of **any** help to an investor?

Standard and Poor's website is at: http://www2.standardandpoors.com/portal/site/sp/en/us/page.family/dataservices_cfa/2,9,2,0,0,0,0,0,0,0,0,0,0,0,0,0.html.

Fitch's homepage is at: http://www.fitchratings.com/jsp/corporate/CodeOfConduct.faces?context=3&detail=1.

Notwithstanding the above self-promoting language in each of Defendant's websites, the rating agencies just can't bring themselves to (1) disclose their conflict of interest (in being paid by the very party whose bond they're rating) resulting in their utter lack of objectivity, and that (2) they saw substantial evidence of a valueless bond, due to its backing by toxic mortgages obtained by people with insufficient income or no income, or no ability to meet the adjusted rates due in a couple of years. How could this happen? Simple, just accept hundreds of thousands of dollars and brace for the eventual consequences when the bubble bursts. At the very least, such conduct is indicative of negligence, although Plaintiffs see this conduct as aiding and abetting the commission of a crime, to wit: theft.

### 3.   In re Enron Corp. Securities, Derivatives and ERISA Litigation, 511 F Supp. 2d 792 (Hereafter the Enron case).

(a)   Turning first to S & P's quoted language in the Enron decision at P. 826-27 (at P. 7, lines 18-20 of their brief) we should discuss a few of the Court's remarks:

> … Allowing anyone to sue credit rating agencies who had read the credit rating reports and claimed to have relied upon them and lost money in any endeavor that person undertook would be far more deleterious than beneficial to society as a whole.

How can this statement carry any credibility today?  The Enron decision, to the extent it sheds light on the case presently before the Court (see below why Enron has limited effect on Plaintiffs' complaint), now stands naked in the face of its error:  it gave a green light to the rating agencies to snap up millions of dollars in unearned fees in the past 4 years using deception and non-disclosure thereby achieving their highest incomes ever, all at the expense of the investing public and the U.S. economy.

(b)   Defendant S & P further argues for a free pass on misconduct by the rating agencies by quoting the Court:  "To vigorously participate in the credit rating industry, which provides **useful** information and **objectivity** and not be swayed by risk of unlimited liability for errors to either issuers or investors:…" (S & P brief, P. 7, l.24-27.)

Let's see if this dicta makes any sense today and in the case before the Court.  First, in the case being litigated, there was not only NO useful information provided by these agencies; rather it was false, misleading and disastrous.  How is that useful?  Is this the type of service and performance that is meant to be protected by Enron?  Next, how were the agencies maintaining "independence and objectivity"??  They were not!  They were doing the exact opposite.  They were doing the bidding of the bond issuer who was paying them hundreds of thousands of dollars each, for "selling" their credibility in their dealings with the public.  And how about their being "objective"?  Hardly, as the Defendants saw in their analysis that the

bonds were supported only by about-to-fail collateral and yet subjectively wanted their high fees for a few days work and the sale of their rating for the investing public's benefit (see Declaration of Ronald Grassi and especially Exs. (a), (g)-(k) re emails from and between analysts acknowledging and discussing the flawed collateral and their rating of same anyway, and justifying their misconduct on the investing public by noting they would be long gone from the scene when the bonds defaulted).

(c )  Defendants raise the  "Chilling effect" argument at P. 7, l.21 claiming that these defendants should not be subjected to being sued for their misdeeds:  yes Moody's, Standard and Poor, and Fitch, there should be a right of action and had there been a warning shot fired by the <u>Enron</u> court in 2005 that the agencies' failure to honestly, objectively and expertly evaluate these bonds may subject them to a "chilling" lawsuit, millions if not tens of millions of dollars would not have been lost.

Fortunately, the <u>Enron</u> court did not go so far as to rule out litigation against the rating agencies for fraud and deception.

The <u>Enron</u> case does not limit lawsuits for negligently prepared and supplied information, as explained in the <u>Restatement of Torts</u>:

<u>Section 552 of the Restatement (Second) of Torts</u> (1976), titled "Information Negligently Supplied for the Guidance of Others," provides in relevant part,

> (1) One who, in the course of his business profession or employment, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justiciable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Subsection (2) limits this provision to loss suffered

19

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Comment (h) relating to Subsection (2) states,

The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied. In this particular his liability is more narrowly restricted than that of the maker of a fraudulent representation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it.

… It is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker intends to reach and influence either a particular person or persons, distinct from the much larger class who might reasonable be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. . . . It is not enough that the maker knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated. [**105]

### (d)    The Enron case is not directly applicable to the complaint by the Plaintiffs herein for 3 reasons;

1.    The Enron court balanced the equities of the misconduct of the rating companies against what it perceived, and hoped for, was a greater good: public dissemination of financial information.  The Enron court stated at P. 207:

As noted, credit rating agencies do not profit from the sale of the bonds of any company that they rate for creditworthiness and they perform an essential service for economy and efficiency of the capital markets.

Historic events have since proven how erroneous this basis was for protecting the rating agencies.  They do profit from the sale of the bonds — how else does one explain their

20

collective millions of dollars of profit?  Coupled with the fact that the rating agencies earn zero if the bond is not sold, or if they are not chosen to rate the bond. Further, in view of what we now know about the economy's collapse and the role of the Defendants in that collapse, how can any court claim the services they  provided were either essential or efficient, let alone truthful, correct, professional nor independent?

(e)     The Enron case dealt with a Connecticut company <u>with</u> **great economic expertise, was acting illegally, and was not suing over its purchase of bonds rated generally by the defendants, but rather was suing over a loan it made to Enron.**

The Court stated at P. 826-827:  "At most, the credit rating agencies were rating Enron's creditworthiness for repayment of specific bonds issued during 2000.  CRRA did not purchase these bonds.  Instead, it made a loan to Enron that was independent of the bonds**.... Moreover CRRA was an experienced business entity with substantial business acumen. Furthermore there is a fact issue as to whether CRRA knew that it was acting ultra vires and improperly in making an allegedly disguised, unsecured loan to Enron, a matter that cannot be determined at this stage." (Emphasis added.)**

(f)     The Enron decision was rendered before the economic collapse of the U.S. real estate and stock market collapse which began in about 2007.  Following the collapse, Congress uncovered a great deal of embarrassing information and methodology hidden by these Defendants.  (See Ronald Grassi Declaration, starting with the declaration of its chairman, U.S. Representative Henry Waxman, Chairman of the Investigating Committee at Ex. B:  "The story of the credit rating agencies is a story of colossal failure.  The rating agencies occupied a special place in our markets.  Millions of investors rely on them for independent, objective assessments.  The rating agencies broke this bond of trust.  The result is that our entire financial system is now at risk…."  This is from the Chairman of the Committee on Oversight and Government Reform.  110th Congress on Oct. 22, 2008, whose

21

committee was and is trying to get to the bottom of the role played by the rating agencies in the country's economic collapse.)

**(g)     The <u>Enron</u> decision does not protect the Rating Companies from all of its  mistakes nor reckless  publications.**

(1)     Erroneous ratings tied to malice and/or reckless disregard for the truth are exempt.

(2)     Ratings targeting a specific group of investors are exempt: See <u>In re National Century Fin. Enters.</u> 580 F Supp 2d 630 where the Court specifically held that First Amendment protection was not available if the Ratings were targeting a specific investor group.  In the case presently before the Court, Lehmans and the Defendants, aiding and abetting each other, targeted the specific class of bond investors looking for investment-grade secure bonds as well as  certain investment banking firms, including Stone and Youngberg in San Francisco (Plaintiffs' broker) to sell their rated bonds to Stone and Youngberg's investor pool, of which the Grassis were members.

**4.     THE <u>FITCH</u> CASE AND SEVERAL COMMENTATORS HAVE REFOCUSSED THE ANALYSIS.**

<u>In re Fitch (2nd Cir)</u> at 330 F.3d 104 (2003), overlooked by defendants,  dealt with a party attempting to obtain records from Fitch through discovery (which Plaintiffs herein have not yet been able to commence).  A brief background and the court's holding is set forth herein in detail due to the importance of this case:

Fitch is a New York-based company in the business of analyzing and rating securities and debt offerings.  When one of Fitch's clients — for example, a corporation or bank — is planning to issue a security, it contracts with Fitch to rate that security.  The issuing company pays Fitch a fee; in exchange, Fitch will research, analyze, and provide a rating of the proposed transaction.  The rating reflects Fitch's expert opinion of the underlying financial strength of the

22

security.  This rating may take into consideration various factors, but usually will consider such issues as the likelihood of default or the expected rate of return.  The ratings themselves are based on the aggregate of all the relevant factors, and are expressed in the form of letters or combinations of letters that indicate the relative safety or risk of the security, with "+" and "-" signs also employed to signify shades of risk within a given rating score.  For example, an "investment grade" bond issue that offered the lowest level of risk might be rated "AAA" by Fitch, and a "non-investment grade" **[**4]** bond that carried a higher risk of default might be rated "BB" or "BB+."  Fitch communicates its rating to the client, but also makes rating information available to the general public for free for a limited time on its web site.  When the short period of time that the ratings reports are publically available expires, the ratings are transferred to an archive, where they may be retrieved by customers that pay a subscription fee for the privilege.

Clients have their securities rated for two reasons.  First, once the security or debt has received a favorable rating, that rating makes it easier to sell the security to investors, who rely upon Fitch's analysis and evaluation.  The second reason is that a favorable rating carries with it a regulatory benefit as well.  Fitch, along with its direct competitors Amici Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P"), has been designated by the Securities and Exchange Commission ("SEC") as a "nationally recognized statistical rating organization" ("NRSRO") whose endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based **[**5]** on the securities' NRSRO ratings.  *See* SEC. AND EXCH. COMM'N, REPORT ON THE ROLE AND FUNCTION OF CREDIT RATING AGENCIES IN THE OPERATION OF THE SECURITIES MARKETS 5-8 (Jan. 2003), *available at* http://www.sec.gov/news/studies/credratingreport0103.pdf (last visited May 20, 2003).

Plaintiff-Appellee American Savings Bank, FSB ("ASB") is a federally-chartered savings bank based in Hawaii. As a savings bank, ASB is regulated by the Office of Thrift Supervision ("OTS"). Regulations forbid savings banks like ASB from buying and holding securities that are not liquid and are not considered investment grade. *See* 12 C.F.R. § 560.40 (2002).  Defendant UBS PaineWebber, Inc. ("PaineWebber") is one of ASB's longtime brokers.  In 1999, PaineWebber created securities specifically tailored for ASB.  These securities were supposed to  **[*107]**  satisfy the OTS regulations that govern ASB's investments.

The securities at issue were so-called "principal protected" securities that were based on equity in a "Collateralized Loan Obligation" ("CLO").  A CLO is created by aggregating large numbers of commercial debt obligations, dividing the rights to the repayment stream into many **[**6]** subdivisions, and selling those subdivisions as tradable securities.  PaineWebber combined the rights in the CLO with other investment interests with the goal of yielding a security that was "investment grade" as to risk and that guaranteed the return of principal at a future date.  The goal was to create a specialized security that would enable ASB to reap the higher rate of return associated with equity investments, while satisfying the regulatory requirement that it not actually own equity (with its attendant risk to principal).

This financial scheme would be accomplished by directing ASB's investment capital into a trust, which would then issue "Trust Certificates" to ASB.  The trust would then "swap" the money for the CLO equity, in an arrangement that

provided that the counter-party to the swap would pay ASB an amount of money equal to ASB's principal investment, as well as the proceeds from the CLO cash flow; this payment was to be made at a specified time in the future (as if it were a bond maturing).

ASB agreed to the deal, and between 1999 and 2000 it invested approximately $ 83 million in the Trust Certificates.  Not long after the last transaction was consummated, however, **[**7]**  OTS told ASB that the transaction was illegal, because the CLOs were not considered "investment grade," as required by regulations, and it ordered ASB to dispose of the investment.  ASB attempted to return the Trust Certificates to PaineWebber, which refused to accept them.  ASB then sued PaineWebber in the United States District Court for the District of Hawaii, seeking recission of the investment agreements and damages for negligence and breach of warranty.

PaineWebber had NRSROs perform ratings at two points during the transactions.  First, Moody's issued a private letter rating of the swap agreements based on the financial strength of the counter-parties and the likelihood that ASB would get its principal back.  Second, the underlying CLOs were fully rated by both Fitch and Moody's.

During discovery in the underlying suit, ASB unearthed facts that led it to believe that PaineWebber and Fitch had extensive communications about the structure of the transactions that created the Trust Certificates (which Fitch did not, in the end, rate).  These communications concerned what Paine Webber needed to do to earn an "investment grade" rating from Fitch.  Specifically, ASB alleges that PaineWebber **[**8]**  and Fitch communicated about (1) whether Fitch would rate the Trust Certificates; (2) whether this type of security could ever be rated investment grade; (3) the methodology of the modeling used to perform the ratings; and (4) what changes to the deal's structure would be required to achieve the desired rating.

According to ASB, PaineWebber claims to have relied on information it received from Fitch in making certain marketing representations to ASB as to the risk level and anticipated rate of return of the investment.  Because discovery materials produced by PaineWebber to ASB are incomplete, ASB subpoenaed Moody's and Fitch seeking information about their dealings with PaineWebber in regard to the investment by ASB.  The subpoenas were served on August 26, 2002, in the Southern District of New York.

 **[*108]**  Fitch refused to produce any documents or submit to any depositions, claiming the protection of the New York Press Shield Law.  After negotiations failed, $\underline{1}$ ASB moved to enforce the subpoenas, and Fitch counter-moved to quash the subpoenas.  The district court issued an Opinion and Order dated December 16, 2002, resolving the issue in ASB's favor.  When Fitch refused to comply with the **[**9]**  subpoena, the district court held Fitch in contempt in an Order and Judgment dated January 16, 2003.  This appeal followed.

The court held:  After reviewing the record, we find that the material filed under seal to be directly relevant to this issue.  In light of the protective order in place in this action, we only discuss this evidence in general terms.  <u>We conclude that the sealed material makes it clear that ASB's claim that Fitch plays an active role in structuring the transaction is extremely credible</u>.  ASB submitted under seal electronic mail correspondence that indicates fairly strongly that Fitch played an active role in helping PaineWebber decide how to structure the transaction.  The sealed portion of the record consists of the

24

Declaration of Paul Alston (ASB's lawyer in the Hawaii action) and attachments. The attachments reflect a series of electronic mail and fax communications between a Fitch employee and two of PaineWebber's employees. This correspondence indicates a fairly active **[\*111]** role on the part of the Fitch employee **[\*\*18]** in commenting on proposed transactions and offering suggestions about how to model the transactions to reach the desired ratings. *See, e.g.*, Alston Decl., Ex. 1 (Fitch employee providing modeling assumptions that indicate what statistics are necessary to achieve various ratings); *id.* Ex. 4 (Fitch employee suggesting changes in the deal structure). We are not suggesting that any of these communications are improper, of course. However, we believe that they reveal a level of involvement with the client's transactions that is not typical of the relationship between a journalist and the activities upon which the journalist reports. Accordingly, we believe that this evidence also counsels strongly against finding that Fitch may assert the privilege for this information.

Taking these two factors together, we conclude that the district court did not abuse its discretion in finding that Fitch was not entitled to assert the journalist's privilege for the information at issue. For the sake of clarity, we note that we are not deciding the general status of a credit rating agency like Fitch under New York's Shield Law: Whether Fitch, or one of its rivals, could *ever* be entitled to **[\*\*19]** assert the newsgathering privilege is a question we leave for another day. Nor do we seek to amplify or interpret New York law beyond the facts of this case. We simply conclude that on these facts, the district court did not abuse its discretion by concluding that Fitch had not sufficiently shown that the information it sought to protect was gathered pursuant to the newsgathering activities of a professional journalist…. (Emphasis added.)

The two key factors removing First Amendment protection for the rating agencies were: (1) A rating company playing an active role in structuring the investment — not just rating it and (2) only reporting on a company that paid them to be reported — unlike reporters and the like who report on any newsworthy event without pay from the subject of the report.

>        **5.**    **Apart from <u>Fitch</u> infra and other more recent cases, several commentators including law professors and well-known economic commentators have addressed the First Amendment issue.**

>              (1)      In an article published by Bloomberg Law Reports on Nov. 2007, written by David J. Grais and Kostas Katsiris, entitled: "Not The World's Shortest Editorial," the following appears:

> "There is a pattern in these decisions, and it augurs poorly for the rating agencies in litigation about their over-rating of privately-placed structured securities. One important factor is whether the agency rates most or all

25

securities of a particular kind for the benefit of the investing public, or instead rates only those securities it is hired to rate.[21]  A second is whether the rating agency merely gathered information about the security it rated or also participated in structuring the security.[22]  And a third is whether the security was offered to the public or placed privately.[23]  In the arena of structured finance (as opposed to the traditional rating of corporate or governmental debt), all of these factors weigh against the rating agencies.  They rarely if ever rate securities they are not hired to rate; reliable information suggests that they often commented (or did until recently) on how a security could be structured to achieve a desired rating; and almost all CDOs and similar instruments are placed privately and confidentially."

(2)     To the same effect, see "The Ratings Charade" by Richard Tomlinson and David Evans, published in <u>Bloomberg Market</u>, July 2007:

The three leading rating companies, all based in New York, say that policing CDOs isn't their job.  They just offer their educated opinions, says Noel Kirnon, senior managing director at Moody's.  "What we're saying is that many people have the tendency to rely on it, and we want to make sure that they don't," says Kirnon, whose firm commands 39 percent of the global credit rating market by revenue.  S&P, which controls 40 percent, asks investors in its published CDO ratings not to base any investment decision on its analyses.  Fitch, which has 16 percent of the worldwide credit rating field, says its analyses are just opinions and investors shouldn't rely on them.

The rating companies apply their usual disclaimer about the reliability of their analyses to CDOs. S&P says in small print:  "Any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision."

Joseph Mason, a finance professor at Philadelphia's Drexel University and a former economist at the U.S. Treasury Department, says the ratings are undermined by the disclaimers . "I laugh about Moody's and S&P disclaimers," he says.  "The ratings giveth and the disclaimer takes it away.  Once you're through with the disclaimers, you're left with very little new information."  When it comes to CDOs, rating companies actually do much more than evaluate them and give them letter grades.  The raters play an integral role in putting the CDOs together in the first place.

Banks and other financial firms typically create CDOs by wrapping together 100 or more bonds and other securities, including debt investments backed by home loans.  Credit rating companies help the financial firms divide the CDOs into sections known as tranches, each of which gets a separate grade, says Charles Calomiris, the Henry Kaufman professor of financial institutions at Columbia University in New York.

Credit raters participate in every level of packaging a CDO, says Calomiris, who has worked as a consultant for Bank of America Corp., Citigroup Inc., UBS AG and other major banks.  The rating companies tell CDO assemblers how to squeeze the most profit out of the CDO by maximizing the size of the tranches with the highest ratings, he says.  "It's important to understand that unlike in the corporate bond market, in the securitization market, the rating

26

agencies run the show," he says.  "This is not a passive process of rating corporate debt.  This is a financial engineering business."

Credit raters consult with bankers in determining the makeup of a CDO, and banks make the final decisions, says Gloria Aviotti, Fitch's global head of structured finance.

As home buyers and investors grapple with the subprime mortgage crisis (see "The Subprime Sinkhole"), many haven't yet realized the extent to which that turbulence is spilling into CDOs.  Foreclosure filings in the U.S. surged to 147,708 in April, up 62 percent from April 2006, as subprime borrowers stopped making mortgage payments, research company RealtyTrac Inc. said on May 15….

CDOs have been a bonanza for the rating companies.  In the past three years, S&P, Moody's and Fitch have made more money from evaluating structured finance — which includes CDOs and asset-backed securities — than from rating anything else, including corporate and municipal bonds, according to their financial reports.  The companies charge as much as three times more to rate CDOs than to analyze bonds, published cost listings show.  The companies say these fees are higher because CDOs are so complex compared with a single bond.

Structured finance is the largest and fastest-growing source of credit rating revenue.  Moody's reported revenue of $1.52 billion in 2006 for credit rating.  Structured finance accounted for 44 percent, or $667 million.  Company credit ratings were the second-largest source of revenue, drawing $485 million.  In the first quarter of 2007, structured finance rose to 46 percent of Moody's rating revenue.

"CDOs are the cash cow for rating agencies," says Frank Partnoy, a former bond trader, now a University of San Diego law professor and author of Infectious Greed:  How Deceit and Risk Corrupted the Financial Markets (Henry Holt & Co., 464 pages, $27.50).  "They're clearly a gold mine.  Structured finance is making a lot of Moody's shareholders and managers wealthy."

Shares of Moody's, which is the only stand-alone publicly traded rating company, have more than tripled to $68.60 on May 9 from $20.65 at the beginning of 2003.  S&P charges as much as 12 basis points of the total value of a CDO compared with up to 4.25 basis points for rating a corporate bond, company spokesman Chris Atkins says.  (A basis point is 0.01 percentage point.)  That means S&P charges as much as $600,000 to rate a $500 million CDO.  Fitch charges 7-8 basis points to rate a CDO, more than its 3-7 basis point fee to rate a bond, based on the company's fee schedule.  Moody's doesn't publish its pricing for any ratings.

Fitch, which is 80 percent owned by Paris-based Fimalac SA, a publicly listed investment company, says that rating structured finance accounted for 51 percent of total revenue of $480.5 million in the fiscal year ended on Sept. 30, 2006.  Fimalac's share price has almost tripled in value since the start of 2003, trading at 80 euros ($108.40) on May 9."

(3)    Note also In the Skeptical CPA, filed May, 2009 as follows:

SUNDAY, MAY 10, 2009

Rating Agency Nonsense

Faced with a rash of litigation over their ratings of mortgage-backed securities, credit-rating agencies are hoping to rely on a long-time legal ace-in-the-hole: the Constitution.  But that protection is being questioned amid allegations that the firms had conflicts of interest that encouraged them to give unduly rosy opinions about the credit-worthiness of securities backed by subprime mortgages. … US regulators and lawmakers are considering stricter oversight of credit-rating firms, including the way the firms are paid, in an effort to minimize potential conflicts. … Yet to succeed in court, investors may need to navigate a thorny constititional issue:  Are the ratings that the sevices give securities — ranging from triple-A to junk — simply 'opinion' that is protected by the First Amendment?  Traditonally, the answer has been yes.  Rating firms generally enjoy a free-speech right to 'make informed, thoughtful predictions about the future,;' says UCLA School of Law professor Eugene Volokh, a First Amendment expert.  'That is no different from what newspapers or scholars do.' … To get around the Constitution, judges have ruled, a plaintiff would have to show that a rating firm not only made false statements, but did so with 'actual malice' — a high legal hurdle. … Richard Blumenthal, the Connecticut attorney general, sees it differently.  Mr. Blumenthal has filed a lawsuit about ratings issued by S&P, though not in connection with mortgage-backed securities.  'The very nature of [rating firms'] so-called speech is very different from the classic First Amendment-protected expression,' Mr. Blumenthal says.  'It's much more akin to an advertisement that misstates the price of an item on sale than a political candidate on a soapbox.' … 'The claims asserted by the Attorney General violate First Amendment rights and would result in **an erosion of analytical independence**,' the company said.  S&P, Moody's and Fitch have denied wrongdoing in all suits brought along these lines. … Rating firms, they say, could have a hard time claiming free-speech rights if courts construe their ratings of mortgage-backed securities to be akin to private commercial transactions.  'The more it looks like [ratings] firms were hired specifically to do this one rating for this one company … the less likely it is that the First Amendment will be applied,' says Larry Ellsworth, a parther with Jenner & Block LLP and a former litigator at the SEC", my emphasis, Nathan Koppel at the <u>WSJ</u>, 21 April 2009.

That rating agencies (RA) have pled this up to now shows how corrupt the SEC is.  Will the SEC now say CPA firm opinions should be exempt from suit?  Decades ago the SEC should have told the RA it will strip any RA of its NRSRO designation if it asserts a "free speech" defense in a malpractice case.  The SEC protects the RA, itself and the RA "clients", the banks.  Volokh, that's nonsense.  RA are "experts".  Like other experts, their "opinions" should be subject to suit.  Part of the problem I see is a failure to apply the law to the RA.  Which law?  18 USC 225, continuing financial crimes enterprise.  Why not apply it?

In view of the above cases and commentators, it is difficult to see how the

Court can grant a Motion to Dismiss based upon the First Amendment as at

28

least 2 key questions OF FACT need to be determined first:

    (1) participation by the rating agencies in the structuring of the bonds they

        were rating

    (2)  payment of money for the rating v. no payment, no rating


    **6.  A Disclaimer clause can not protect a rating Agency from the type of misconduct in this case and in certain specific situations.**


    (a)  See <u>Mehmet v. Paypal</u> 2009 US Dist Lexis 29846 which held:  "Limitations of liability clauses generally are enforceable, but there are circumstances in which a liability limitations clause is not enforceable, such as when the party relying on the clause acted in bad faith or engaged in fraud, as noted in two of the cases cited by plaintiff." *See* Opp. at 28, citing <u>Valve Corp. v. Sierra Entertainment Inc., 431 F. Supp.2d 1091, 1101 (W.D. Wash. 2004)</u>  **[\*12]** and <u>Colonial Life Ins. Co. of Amer. v. Elec. Data Sys. Corp., 817 F. Supp. 235, 242-43 (D.N.H. 1993)</u>.  Other case law, cited by those cases, is in accord.  *See* <u>*RRX Indus. v. Lab-Con, Inc., 772 F.2d 543, 547 (9th Cir. 1985)*</u>; <u>S.M. Wilson & Co. v. Smith Int'l, 587 F.2d 1363 (9th Cir. 1978)</u>.


    (b)    See, also <u>In re Countrywide</u> 588 F Supp. 2d 1132 (2008) where a truth-on-the-market defense was disallowed involving mortgage backed securities:

> "OVERVIEW:  From mid-2003 onward, the CAC alleged the corporation continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006.  The claims arose because, throughout the class period, corporate officers publicly denied that underwriting standards had deteriorated.  Inter alia, the corporation employed a misleading definition of "subprime."  That and other practices were combined with a shift to new, inherently more risky loan products such as adjustable-rate mortgages (ARMs). The court rejected the corporation's truth-on-the-market defense at the pleading stage.  The corporation's mortgage-backed securities (MBS) were complex instruments and the prospectuses were very large documents; it was perfectly reasonable to infer that this complexity, coupled with the corporation's alleged public misrepresentations, would **blunt** the effect of any **disclosures** in the MBS' prospectuses.  Claims were adequately pled under § 11 of the Securities

29

Act of 1933, 15 U.S.C.S. § 77k; and §§ 10(b), 20(a), and 20A(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. §§ 78j, 78t, and 78t-1.

(c)     Unconscionable provisions in class action type cases are often unenforceable. For example, see:

> The court reasoned that, because the clause barred any class action, in or outside arbitration, it functioned to "exculpate the drafter from liability for a broad range of undefined wrongful conduct, including [*1219] potentially intentional wrongful conduct, and that such exculpation clauses are substantively unconscionable." Id. at 1008. The court concluded: "HN6A clause that unilaterally and severely limits the remedies of only one side is substantively unconscionable under Washington law for denying any meaningful remedy." Id. Lowden v. T-Mobile USA, Inc., 512 F.3d 1213, 1218-1219 (9th Cir. Wash. 2008).

To the same effect: (d) "The instant case, of course, is not a consumer contract but rather an employment contract.  Nevertheless, the California Supreme Court has made clear that the analysis used in consumer cases is the same analysis to be used in employment cases; that is, the question is whether a class action or arbitration waiver in an employment contract acts as an exculpatory clause.  See id. at 457; see also Murphy v. Check 'N Go of Cal., Inc., 156 Cal. App. 4th 138, 148, 67 Cal. Rptr. 3d 120 (2007) (in an employment case, noting that a waiver is unconscionable when it "is in practice the exemption of defendant from responsibility because a class action would be the only effective way to halt and redress the alleged violations") (internal quotation marks omitted).  (Emphasis added.)  Jackson v. S.A.W. Entm't, Ltd., 2009 U.S. Dist. LEXIS 47410 (N.D. Cal. May 21, 2009).

(e)  A question for each Defendant:  How do you charge approx. $1,000,000 for a rating and yet post on your respective websites for all the investing world to see a statement basically saying you can't be held accountable for the accuracy and completeness of your $1,000,000 analysis?
.

## 7.     Privity is satisfied as Plaintiffs are 3rd party beneficiaries or "intended beneficiaries" or "foreseeable recipients" of the ratings.

Before discussing the cases below, it is necessary to recall that what the bond issuer does in these types of mortgage-backed securities cases is TO CREATE a 3 party arrangement:  the issuer (1st party) agrees to pay the rating company (2nd party) a fee if it will publish an acceptable rating for the viewing, i.e., benefit of a portion of the investing public

30

that is specifically searching for bonds (3rd party.)  The issuer has no other motive for the

rating.  If the rating were not for publication, there would be no fee.  If the public for some

reason stopped buying bonds, there would be no further ratings.  Several cases discuss

3rd party beneficiary arrangements.  Following are a few key quotes and citations from a few

such cases:

(1) "The California Supreme Court has consistently employed a six factor "special relationship" analysis to determine whether a plaintiff lacking privity with a defendant may recover purely economic loss in claims for negligent performance of services.  See J'Aire, 598 P.2d at 63 (finding a "special relationship" to allow recovery of lost business and lost profits arising out of negligent performance of renovation services by a defendant not in privity with the plaintiff); see also Aas, 12 P.3d at 1138 (applying the "special relationship" analysis to a claim for economic loss in a negligence action brought by a homeowner not in privity with a building contractor to recover costs to repair defective construction, but denying the claim because plaintiff showed no present injury).

Under J'Aire, the court looks at six criteria to determine the existence of a special relationship:  (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached  [*6] to the defendant's conduct and (6) the policy of preventing future harm.  J'Aire, 598 P.2d at 63.

In the present case, the district court did not properly and fully apply J'Aire.  First, the district court, citing Aas, misinterpreted California law by stating, "the California Supreme Court has confirmed that the presence of one of the J'Aire special relationship factors, 'the degree of certainty that the plaintiff suffered injury,' creates an exception to the economic loss rule." We hold that the California Supreme Court has not identified "the degree of certainty that the plaintiff suffered injury" as an exception to the economic loss rule.  Rather, the court has identified this factor as one of six in determining whether a special relationship exists that would permit recovery of purely economic losses in negligence.  See J'Aire, 598 P.2d at 63; Aas, 12 P.3d at 1138.

In J'Aire, the California Supreme Court fully considered each of the six factors and found a special relationship justifying recovery of economic loss.  J'Aire, 598 P.2d at 63-64.  In Aas, the court again discussed all six factors, concluding that no special relationship existed because, while factors one and four were present,  [*7] factors two, three, five, and six were not.  Aas, 12 P.3d at 1137-39.  In the present case, the district court erred by not fully considering all six factors.  Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., 2008 U.S. App. LEXIS 21335, 5-7 (9th Cir. Cal. Oct. 8, 2008).

See also the Fox case:  (2)" Appellants contend, however, that respondent owed them a duty of professional care even if they were not his clients. CA(5)(5) With certain exceptions, an attorney has no obligation to a nonclient for the consequences of professional negligence — that is, the

---

31

attorney is not burdened with any duty toward nonclients merely because of his or her status as an attorney. n3 The existence of such a duty is a question of law dependent upon "a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances. [Citations.]" (Goodman v. Kennedy (1976) 18 Cal.3d 335, 342 [134 Cal.Rptr. 375, 556 P.2d 737]; Banerian v. O'Malley (1974) 42 Cal.App.3d 604, 612 [116 Cal.Rptr. 919]; Starr v. Mooslin (1971) 14 Cal.App.3d 988, 998 [92 Cal.Rptr. 583].) HN3The [***8] imposition of a duty of professional care toward nonclients has generally been confined to those situations wherein the nonclient was an intended beneficiary of the attorney's services, or where it was reasonably foreseeable that negligent service or advice to or on behalf of the client could cause harm to others. "[The] determination whether in a specific case the [attorney] will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the [attorney's] conduct and the injury, and the policy of preventing future harm. [Citation.]" ( Lucas v. Hamm (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685]; Heyer v. Flaig (1969) 70 Cal.2d 223, 227 [74 Cal.Rptr. 225, 449 P.2d 161]; Mason v. Levy & Van Bourg (1978) 77 Cal.App.3d 60, 67-68 [143 Cal.Rptr. 389].) Fox v. Pollack, 181 Cal. App. 3d 954, 959-960 (Cal. App. 1st Dist. 1986).

See also the Jackson case:  (3) The court in Bily also noted HN9there is another class of people "who, although are not clients," may recover on a theory of negligent misrepresentation, n2 rather than negligence because they may reasonably come to receive and rely upon an audit report, and whose existence constitutes a risk of audit reporting that may fairly be imposed upon the auditor.  The Bily court found that such persons are "specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report." Bily, 3 Cal. 4th at 406-7, 11 Cal. Rptr. 2d at 73.  J&D argues that it may fall within this exception.  To survive a motion for summary judgment, however, J&D must have established a genuine issue of [**18] fact that Stuart Maue intended to induce reliance on the audit report and that J&D did in fact justifiably rely on the report to its detriment.  n3 Here, Stuart Maue was hired by only Golden Eagle to perform the audit for Golden Eagle's purposes under Golden Eagle's direction.  This factor alone suggests [*1201]  the audit engagement was designed to benefit only Golden Eagle and not J&D.  If the audit found no irregularities J&D would gain nothing.  In addition, as we discuss next, the district court did not err in concluding J&D did not present evidence of reasonable reliance.  Therefore, it cannot recover on a negligent misrepresentation exception under Bily.

HN10The elements of negligent misrepresentation include:
(1) misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the misrepresentation, (4) ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed, and (5) resulting damage.  Lincoln Alameda Creek v. Cooper Industries Inc., 829 F. Supp. 325, 330 (N.D. Cal. 1992) (citing Fox v. Pollack, 181 Cal. App. 3d 954, 226 Cal. Rptr. 532 (Ct. App. 1986)). [**19]

n3 HN11Bily creates an objective standard that looks to the specific circumstances to ascertain whether a supplier of information has undertaken to inform and guide a third party with respect to an identified transaction or type of transaction.  If such a specific undertaking has been made, liability is

imposed on the supplier.  If, on the other hand, the supplier "merely knows of the ever-present possibility of repetition to anyone, and possibility of action in reliance upon [the information ]on the part of anyone to whom it may be repeated," the supplier bears no legal responsibility.  Bily at 410 citing Rest. 2d Torts § 552, com. (h).  Liability is limited to those "whom the engagement is designed to benefit in order to allow the supplier of information to ascertain the potential scope of its liability and make rational decisions regarding the undertaking.  Therefore, in order to recover under a theory of negligent misrepresentation, the plaintiff must be an intended beneficiary of the contract.  Her reliance on the report is otherwise not justified."  Lincoln Alameda Creek, 829 F. Supp. at 330.  Glenn K. Jackson Inc. v. Roe, 273 F.3d 1192, 1200-1201 (9th Cir. Cal. 2001).

And  the Biley case:  (4) "We have employed a checklist of factors to consider in assessing legal duty in the absence of privity of contract between a plaintiff and a defendant. In Biakanja v. Irving (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], a notary public undertook to prepare a will for the decedent and then negligently failed to have it properly attested.  We allowed the decedent's brother, the sole beneficiary under the will, to recover from the notary public. CA(3a)(3a) In permitting negligence liability to be imposed in the absence of privity, we outlined the factors to be considered in making such a decision: HN14"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. … Here, the 'end and aim' of the transaction was to provide for the passing of [the] estate to plaintiff. … Defendant must have been aware from the terms of the will itself that, if faulty solemnization [*398]  caused the will to be invalid, plaintiff would suffer the very loss which occurred.  As [decedent] died without revoking his will, plaintiff, but for defendant's negligence, would have received all of the … estate, and the fact that she received only one-eighth of the estate was directly caused by defendant's conduct."  (Id. at pp. 650-651.)

Viewing the problem before us in light of the factors set forth above, we decline to permit all merely foreseeable third party users of audit reports to sue the auditor on a theory of professional negligence.  Our holding is premised on three central concerns:  (1) Given the secondary "watchdog" role of the auditor, the complexity of the professional opinions rendered in audit reports, and the difficult and potentially tenuous causal relationships between audit reports and economic losses from investment and credit decisions, the auditor exposed to negligence claims from all foreseeable third parties faces potential liability far out of proportion to its fault; (2) the generally more sophisticated class of plaintiffs in auditor liability cases (e.g., business lenders and investors) permits the effective use of contract rather than tort liability to control and adjust the relevant risks through "private ordering"; and (3) the asserted advantages of more accurate auditing and more efficient loss spreading relied upon by those who advocate a pure foreseeability approach are unlikely to occur; indeed, dislocations of resources, including increased expense and decreased availability of auditing services in some sectors of the economy, are more probable consequences of expanded liability.  Bily v. Arthur Young & Co., 3 Cal. 4th 370, 397-398 (Cal. 1992).

".

33

And finally, one of the most recent cases to come out of the 9th Circuit:  the Paulsen case  (5)"Despite the Bily court's holding that an auditor's liability for general negligence is confined to the client, it recognized the possibility that intended third party beneficiaries could recover for an auditor's professional negligence:  In theory, there is an additional class of persons who may be the practical and legal equivalent of "clients."  It is possible the audit engagement contract might expressly identify a particular third party or parties so as to make them express third party beneficiaries of the contract.  Third party beneficiaries may under appropriate circumstances possess the rights of parties to the contract.  Id. at 767 & n.16 (citations omitted); see also Glenn K. Jackson Inc., 273 F.3d at 1199-1200 (recognizing the third party beneficiary "exception" to the Bily rule); Mariani v. Price Waterhouse, 70 Cal. App. 4th 685, 82 Cal. Rptr. 2d 671, 677 (Ct. App. 1999) (same).  The Bily [*43] court stated that it was not presented with a third party beneficiary issue because "[n]o third party is identified in the engagement contract."  Bily, 834 P.2d at 767 n.16.  Although Bily might be read to require that a third party beneficiary's name appear in the engagement agreement in order to give rise to a duty, id., California decisions pre-dating Bily indicate that "[i]t is not necessary that an express beneficiary be specifically identified in the relevant contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created."  Outdoor Servs., Inc. v. Pabagold, Inc., 185 Cal. App. 3d 676, 230 Cal. Rptr. 73, 76 (Ct. App. 1986); see also Mariani, 82 Cal. Rptr. 2d at 679 (noting that despite Bily's use of the term "express" third party beneficiaries, "it does not appear Bily meant to create a new category of specifically designated beneficiaries, whether for tort or breach of contract purposes").

We reverse the district court's dismissal of claims six and seven based on the intended third party beneficiary exception to the general rule announced in Bily.  The Employees have alleged that Towers Perrin "provided actuarial services to the CNF Plan and the CFC Plan  [*44] for the benefit of Plan participants, including Plaintiffs, from at least November 1996 forward . . . ."  They have also alleged that they were "intended beneficiaries of the professional services rendered" by Towers Perrin.  Towers Perrin filed its motion to dismiss before the parties conducted discovery, and Towers Perrin's engagement agreement is not in the record.  In the present procedural posture, we take the Employees' allegations as true.  Cedars-Sinai Med. Ctr., 497 F.3d at 975.  Given Bily's recognition that intended third party beneficiaries might be able to recover from an auditor, combined with the Employees' allegations regarding the benefits Towers Perrin purportedly intended to provide to the plan beneficiaries at the time of the spinoff and post-spinoff, we conclude that the Employees' sixth and seventh claims potentially state a claim upon which relief might be granted. n19 The Employees might be unable to ultimately prevail on a third party beneficiary theory, but we cannot conclude that they have not brought themselves within the third party beneficiary exception insofar as a motion to dismiss is concerned.  Paulsen v. CNF Inc., 559 F.3d 1061 (9th Cir. Cal. 2009).

**II.      PLAINTIFFS MAY NOT BE REQUIRED TO PLEAD ADDITIONAL ELE-MENTS NECESSARY TO STATE A CLAIM FOR NEGLIGENT MISREP-RESENTATION, BUT IF SO ORDERED, CAN AND WILL AMEND THEIR COMPLAINT TO COMPLY.**

As discussed earlier in this Opposition, Plaintiffs contend their pleadings were proper as set forth in their State of California Judicial Council Form and this conclusion did not change once their case was removed to the Federal Court which requires heightened pleadings for fraud and negligent cases.  Had Federal law pre-empted the fields of fraud and negligence, the result would be different.  Defendants, if they are interested in receiving from Plaintiffs a more detailed statement of their position on fraud and negligence need only submit a Request for Further Disclosure, or request that Plaintiffs file a more specific statement of their position at the Rule 26(f) early conference.

If, however, the Court determines that Plaintiffs, once in Federal Court, must replead their state court causes of action to conform with Federal Rules of Procedure, then Plaintiffs request leave to amend, and are able to so comply.

Following are some quotes of testimony taken from the Congressional Hearing "Credit Rating Agencies and the Financial Crisis" held before the H.R. Comm. On Oversight and Government Reform, 110th Cong. (Oct. 22, 2008). These quotes can be found in the exhibits attached to the declaration of Ronald Grassi dated July 2, 2009 which declaration is being filed with this Opposition.  The purpose of this somewhat lengthy list is to demonstrate that evidence presently exists and additional evidence is within reach for use in this case to support plaintiffs' claims of negligence and fraud. (If any difficulty is experienced in accessing the full quotes from the Grassi declaration, then click the following link to access the full set of documents on the Government website:

http://oversight.house.gov/documents/20081023162631.pdf

or click: http://oversight.house.gov/story.asp?ID=2250

1.       "Rating agencies continue to create an even bigger monster-the CDO market. Let's hope we are all wealthy and retired by the time this house of

cards falters"  From an email from Chris Meyer, Ex. H, P.2 dtd 12/16/06

2.    "Yu expressed 'frustration' with the rating agencies' willingness to 'allow issuers to get away with murder'. From  Mary Brennan email, Ex.H dtd 7/11/07

3.    "Why did it take so long for the rating agencies to recognize the problem? Why were standards so low in the first place? And what should be done to see that this does not happen again?  My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pay business model and on rating shopping by issuers of structured securities" (P. 17, l. 355-362)…"In my view, the focus of Moody's shifted from protecting investors to market ratings" ( Ex. R, P. 18, l. 379-380); "…a rating must be correct today in the sense that it fully reflects the views of the analyst or rating committee with no attempts to stabilize ratings" (P. 19, l. 402-407).  Mr. Fons is an economist and worked at Moody's as a managing director until 2007.

4.    "In a nutshell, those versions of the model (referring to an updated model needed to evaluate the change and problems developing post 1999) were never released.  While we had enjoyed substantial support up to this time, by 2001, the stress for profits and the desire to keep expenses low prevented us from in fact developing and implementing the appropriate methodology to keep track of the new products" (referring to the risky sub-prime loans). P. 24, l. 517-522 of Ex. (R). Testimony of Frank Raiter who was the managing director and head of residential mortgage-backed securities for S & P from 1995-2005.

5.    "The ratings of the three companies appearing before this committee today, Moody's, S & P and Fitch, were a major factor in the most extensive and possibly expensive financial calamity in recent American history. (Ex. R, P. 26, L. 550-553)…." But there should be no doubt that none of this would

have been possible were it not for the grossly inflated, unsound and possibly
fraudulent ratings provided to both the asset-backed securities directly
issued as well as companies which dealt in these securities…Insurers paid
huge amounts to these rating companies for not just significant rating fees
but, in many cases, very significant consulting fees for advising the issuers
on how to structure the bonds to achieve maximum triple-A ratings. This
egregious conflict of interest may be the single greatest cause of the present
global economic crisis. (P. 27.L 559-571). Testimony of Sean Egan,
managing director of Egan-Jones Ratings, a rating agency possibly 4th in
size among the rating agencies.

6.      "By the way, the deal is ridiculous (Official #1). "I know, right, (the) model
definitely does not capture half the risk" (Official #2). "We should not be
rating it. (#1). "We rate every deal. It could be structured by cows, and we
would rate it." (#2)…I personally don't feel comfy signing off as a
committee member" (#1).  This exchange, involving S & P personnel, was
from a document submitted by representative Yarmouth (Ex. R, P. 33, L
714-723). Later Rep. Yarmouth asks Mr. Raiter: "…would that mean that
somebody who was relying on the ratings to make an investment in those
securities would not be getting an accurate picture of the risk that was
involved? And Mr. Raiter replied: "I would presume that is an
interpretation" (P. 35-753-757). And Rep. Yarmuth asked: "…what do you
think the official means when she says it could be structured by cows and
we would rate it? And the answer from Mr. Egan: "What it means is that it's
ridiculous" (p. 35, l. 769-773).  And when asked why rating companies
stoop this low, Mr. Egan said: "You can't be sued, effectively" (P. 39, l.
852).  And, also in Ex. R at P. 40, l. 895-899  in discussing surveillance (ie
watching the bond's performance after the issuance): "they didn't even run
the rating model in surveillance area which would have allowed them to

have basically re-rated every deal S & P had rated to that time and see exactly what was going on and whether the support was there for those triple-A bonds" . This remark was from Mr. Raiter responding to Rep. Davis of Virginia.

7.   "Clearly, would you agree there was greed" asked by Rep. Cummings, to which Mr. Egan replied: I think that there was.  Look at the definition of fraud.  When you have—when you hurt somebody and you do it willfully, that is fraud".  Mr. Egan, responding to a follow-up question about fraud on the part of Moody's testified: "Moody's knew there was problems with the model and withheld that information because they didn't want to move off the triple-A….It meets the normal definition of fraud"( Ex.R, P. 56, l. 1253-1270)

8.   On the issue of the analysts being denied access to critical information, Mr. Raiter testified he asked for the collateral tapes which would have given him the FICO scores, loan to value, etc. and the S & P executive in charge of this information responded: "Any request for loan tapes is **totally unreasonable" (Ex. R,** P. 73. L. 1678-1680)

9.   **Rep. Lynch:**  "It is a fact that Moody's and Standard & Poor's especially as rating agencies held a position of trust in relation to investors and market participants and over time over the past 75 years or so investors and market participants were induced to rely on the ratings that were produced by those agencies…."none of the others (referring to other bad actors in the market) held a special responsibility as being a gatekeeper or to serve as a firewall…"…"But the rating agencies facilitated that (global toxicity) by putting triple-A stamps on this, they induced people to rely" (Ex.R, P. 82, l-1874-1887.)

10.  **"**So the triple-A is like the gold standard"  asked by Rep. McCollum of Mr. Fons. Answer: "It is, yeah. That's what Moody's is selling" (Ex. R, P. 89. L.

[PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. CV-00543-JAM-DAD

2052-2055)

11.    Stated by Rep. Sarbanes: "I'll just draw the conclusion myself, which is that you encouraged risky behavior because you rated these things as AAA or reasonable investments when they weren't; and that set off a whole chain of events which resulted in the collapse of the financial markets, and it had the human effect of a lot of people losing their homes, of increased tightening of credit and all the things that we're seeing" (P. 186, l. 4397-4404 of Ex. R)

12.    To whom do the rating companies owe a duty? Mr. Joynt, CEO of Fitch didn't know (P. 199. L. 4712-4716) but Mr. McDaniel, CEO of Moody's admitted the duty was owed to the market (P. 200, l 4721-4724 of Ex. R) [of which plaintiffs herein are a part]. And Mr. Sharma, CEO of S & P, testified: "Responsibility to the investors is the most critical thing for us" P. 200, l. 4734-4735 of Ex. R)

13.    Rep. Waxman summarized it best at P. 213, l. 5017-P. 214, l. 5021: "The explosion of these new, very complicated securities is something very new, but we also have something that's very old: greed and self interest pushing forward a lot of people to do things that in hindsight certainly they regret having done"

14.    Mr. Raiter, managing director at S & P from 1995-2005 explains in Ex. D that S & P failed to implement an updated business model to better evaluate the changes in the residential mortgage market, opined that the updated model had still not been implemented, and that in his opinion, "…had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial loss. (P. 5-6). Mr. Raiter also testifies that the new model was not implemented because improving the old model would not have added to S & P's revenues (P.6)

15.    Ex. E contains Mr. Egan's Statement, wherein he notes, in passing, that

"Given the lucrative nature of the rating business for structured finance ($750,000 to $1,000,000 per issue) rating companies have had incentives to compete for rating assignments" (P. 9)

16.   Ex. F. contains remarks by Mr. McDaniels, CEO of Moody's, saying for example at P. 3 under Rating Erosion by Persuasion:  "Analysts and MDs are continually pitched by bankers, issuers, investors—all with reasonable arguments—whose views can color credit judgment, sometimes improving it, other times degrading it (we "drink the kool-aid")

17.   Ex. L contains the prepared statement of S & P's CEO, Mr. Sharma who basically admits to a certain degree of negligence at P. 3: "It  is now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work"

18.   Ex. C contains several remarks from Jerome Fons, whose last postion at Moody's was Managing Director, Credit Policy. He explains why investors rely heavily on the rating agencies and the lack of transparency concerning the underlying documentation, and then testifies:  "Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool. …Second, the complexity of the securitization process requires extremely sophisticated systems and technical competence to properly assess risk at the tranche level. Third, rating agencies had a reputation, earned over nearly a century, of  being honest arbiters of risk" P. 2

19.   Mr. Joynt, CEO of Fitch Ratings, in Ex. J, reluctantly admits: While we were aware of, and accounted for, in our models and analyses the many risks posed by the subprime mortgages and the rapidly changing underwriting environments in the U. S. housing market, we did not foresee the magnitude or velocity of the decline in the U.S. housing market, nor the

40

dramatic shift in borrower behavior brought on by the changing practices in the market" (P. 2)  [Hmm, what did he say?? Cutting through the verbiage, Mr. Joynt appears to be saying his company failed to take into account the likely performance of these thousands of loans that were underwater for anyone to see and were adjusting to higher interest rates that most of the borrowers could not afford.]

Note:  the above brief summary reflects 19 examples of mistakes, intentional misconduct, etc. taken from 18 separate transcripts encompassing over 1000 pages. Dozens of additional quotes are available, but the point is that there exists in these transcripts alone enough testimony to support plaintiffs' position that they are entitled to the presumption that they have a reasonable chance of prevailing on their counts for negligence and fraud.

**III.   PLAINTIFFS MAY NOT BE REQUIRED TO PLEAD THEIR STATE OF CALIFORNIA COMMON LAW FRAUD CLAIM TO MEET FEDERAL STANDARDS BUT, IF SO ORDERED, WILL DO SO UPON RECEIVING LEAVE TO AMEND.**

Plaintiffs' position re pleading Fraud is the same as with Negligence, and as explained in II above and earlier in this Opposition.

**IV.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE FIRST AMENDMENT.**

**A.   THE CREDIT RATINGS IN THE CASE BEFORE THE COURT ARE NOT PROTECTED OPINIONS, BUT RATHER ARE PROVABLE FALSE STATEMENTS.**

Defendants, having made disastrous predictions of credit risk in the past, having worked with issuers to over-rate the relatively worthless bonds they were examining, having been found enmeshed in an unsavory and usually undisclosed conflict of interest with the issuer of the bond who is also paying them if they like the rating, drags out this time-worn defense:  "We may have made a huge mistake here, millions of people may have lost tens of

41

millions of dollars, we may have aided and abetted our client in pawning off on the public what we knew to be valueless by selling our high rating for profit, BUT we are entitled to walk scott-free because we're entitled to the same protection as newspaper reporters and news agencies.

No news agency or reporter gets paid hundreds of thousands of dollars to report on an event, no news agency or reporter participates in the actual news event being covered and even gives advise to the actors on how to enhance the news event, and no news agency nor reporter limits what they cover based upon whether they're first paid.

Turning to Compuware Corp. v. Moody's Investor's Services, 222 F.R.D. 124 (E.D. Mich. 2004) and without repeating the points in Plaintiffs' Opposition above, it should be noted that (1) these statements do not qualify as opinions because they are provably false statements to assist their client in pawning off on the public these toxic and worthless securities, and for the added incentive of getting paid handsomely for misusing the public's trust by applying a rating they knew to be false.  Just review a few of the exchanges of emails from the Defendants' analysts as set forth in the Exhibits attached to the Declaration of Ronald Grassi, encluding the investments that could have been structured by cows, and the email expressing the hope that these analysts would be long gone and retired when the market collapsed.

It must further be remembered that this blanket First Amendment protection has been rejected or limited judicially.  For example, the Second Circuit rejected First Amendment protection to Fitch.  The point is that for years the Rating Agencies have hidden behind the First Amendment while they went about doing what no journalist would do:  they became involved with their employer-issuer to the point of aiding and abetting the employer-issuer in obtaining millions of dollars, they issued false statements known by their analysts to be false, and they failed to disclose to the public their compensation from the issuer whose bonds they were

(falsely) rating.

It should be remembered that neither the First Amendment nor the <u>Enron</u> case protects a party guilty of <u>fraud</u> nor from publishing a statement with <u>reckless disregard for the truth</u>.

The Court's attention is also directed to another rating case where the Court declined to give the  rating company  blanket First Amendment protection, finding that a **negligent investigation,** if proven, would void the defense of the First Amendment:

"OVERVIEW: Appellant publisher alleged that he was injured in his reputation and business by a false and defamatory credit report issued by appellee credit reporter. On appeal, the court reversed the summary judgment in favor of appellee on the ground that appellee's report was conditionally privileged and that, under the New York Times doctrine, appellee was not liable, absent proof of actual malice. The court held that appellant's credit report was not a matter of public interest and concern; thus the credit report was not entitled to protection imposed by constitutional guarantees of freedom of speech and of the press. The court ruled that, because the information upon which appellee based the credit report was from an unknown source and was not updated annually, a trier of fact could infer that appellee failed to make a proper investigation on a genuine issue of material fact. Thus, there was an indication that appellee had abused its conditional privilege. The court determined that appellant suffered special damages because it was revealed that the credit report could have been the reason for appellant's failure to secure a lease or purchase a building.

OUTCOME: The court reversed the award of summary judgment in favor or appellee credit reporter because appellant publisher's credit rating did not protect appellee from libel suits; appellee failed to make a proper investigation on a genuine issue of material fact; and, as a result of the adverse credit report, appellant suffered special damages as he was not able to purchase a building."

**Oberman v. Dun & Bradstreet, Inc., 460 F.2d 1381 (7th Cir. Ill. 1972)**

Admittedly Oberman was suing over a bad rating of his own

[PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. CV-00543-JAM-DAD

company whereas plaintiffs are suing over a bad rating they relied

on concerning a business not owned by the plaintiffs, but the legal

principle emerged that  First Amendment protection was conditional,

and a negligent report could become the basis for a proper claim in

an appropriate situation.

### B.    PLAINTIFFS, IF SO ORDERED, WILL AMEND THEIR COMPLAINT TO ALLEGE EITHER MALICE OR RECKLESS DISREGARD.

Plaintiffs will plead and meet the standard required of New York Times Co. v. Sullivan, 376 U.S. 254, if so required.  Further Plaintiffs will comply with the suggestion in First Equity Corp. v. Standard and Poor's Corp., 690 F. Supp. 256 (S.D.N.Y. 1988) which Defendant quotes as follows:  "… the court found that plaintiff failed to put forth 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"

In this case pleading such First Equity doubts will be done based on limited facts known to Plaintiffs and will be supported by evidence produced at the recent Congressional Investigation; the Court at this time may wish to review in detail the testimony at that hearing as reflected in the 18 statements set forth in declaratory or testimonial format in the exhibits referenced in the Declaration of Ronald Grassi, attached.

### CONCLUSION

For the foregoing reasons, the 3 Motions to Dismiss should be dismissed.  If , however, the Court grants any portion of said motions, then plaintiffs should be granted a reasonable time to amend and to pursue limited discovery. Several defenses raised by the defendants, such as the First Amendment protection, raise questions of fact such as: (1) did the defendants help Lehmans in structuring the bonds plaintiffs purchased in order to achieve a higher rating for the bonds and (2) did these defendants only cover these and other offerings for pay, and if not paid, would they have rated these bonds anyway as part of some business practice as followed by regular journalists who rate any newsworthy story and do so without getting paid  to cover the story.  Finally, plaintiffs request the immediate right to pursue limited discovery as outlined above (P.10-12).

Dated: July 2nd, 2009             Respectfully submitted

                                                            /s/
                                                 Ronald Grassi, pro se


                                                             /s/
                                                 Sally Grassi, pro se

                                                 P.O. Box 6961
                                                 Tahoe City, Calif.
                                                 (530) 583-3105
                                                 ronsallygrassi@mac.com