1

RONALD M. GRASSI,
SALLY M. GRASSI

2

P. O. Box 6961
Tahoe City, CA 96145

3

Telephone:  (530) 583-3105
Email:  ronsallygrassi@mac.com

4

5

Plaintiffs, In Pro Per

6

7

UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

9

RONALD M. GRASSI and
SALLY GRASSI,

10

11

Plaintiffs,

12

- vs -

13

MOODY'S INVESTORS SERVICE, INC.
("MOODY'S"), THE McGRAW-HILL
COMPANIES, INC. ("McGRAW-HILL")
AND FITCH, INC. ("FITCH"),

14

15

Defendants.

16

17

Case No.: 2:09  CV-00543-JAM-DAD

**PLAINTIFFS' FIRST AMENDED
COMPLAINT FOR:**
   **1.  NEGLIGENT
      MISREPRESENTATION**
   **2.  INTENTIONAL
      MISREPRESENTATION**
   **3.  AIDING AND ABETTING**

**DEMAND FOR JURY TRIAL**

**DEMAND FOR DISCOVERY
BEFORE COURT RULES ON
MOTION TO DISMISS**

18

19

**I.   THE PARTIES**

20

   **1.  Plaintiff Ronald M. Grassi is an individual residing in Tahoe City,**

21

     **Calif. who formerly practiced law in California and purchased two**

22

     **bonds issued by Lehman Brothers as described below, which**

23

     **bonds were rated by the defendants herein. Plaintiff Ronald Grassi**

24

     **sues defendants, and each of them, as set forth above, based on**

25

     **California common law**

26

   **2.  Plaintiff Sally Grassi is an individual residing with plaintiff in Tahoe**

27

     **City, Calif., is married to plaintiff Ronald M. Grassi, was formerly a**

28

     **school teacher in California and is a co-owner of the subject**

     **Lehman bonds. Plaintiff Sally Grassi sues defendants, and each of**

them, as set forth above, based on California common law.

3. Defendant Moody's Investors Service, Inc (hereafter referred to as Moody's) is believed to be a New York corporation doing business in California and is engaged, inter alia, in the business of rating certain bonds, mostly those for which it is paid to rate as opposed to covering an array of securities as a more traditional press outlet would do.

4. Defendant The McGraw Hill Companies, Inc. (hereafter McGraw Hill) is believed to be a New York corporation doing business in California and is engaged, inter alia, in the business of rating certain bonds, mostly those for which it is paid to rate as opposed to covering an array of securities as a more traditional press outlet would do.

5. Defendant Fitch Inc (hereafter Fitch) is believed to be a New York corporation doing business in California and is engaged, inter alia, in the business of rating certain bonds, mostly those for which it is paid to rate as opposed to covering an array of securities as a more traditional press outlet would do.

## II.   BACKGROUND LEADING UP TO HOW AND WHY THE DEFENDANTS OVER-RATED LEHMAN BROTHER'S CORPORATE BONDS WHICH WERE THEN SOLD TO PLAINTIFFS AND ARE NOW WORTHLESS

Prior to the year 2000, most home loans were conventional and their performance predictable.  Most of these loans involved detailed credit checks by the borrower's lender and 20% down.  This prudent and long-standing lending procedure produced a low and consistent default rate and  allowed rating companies to predict the future risk of  a mortgage default. Then something major happened after 2000:  Would-be borrowers were allowed, in fact, encouraged, to put less down than the conventional 20%; often 10% down, then finally nothing down. Other borrowers were allowed to receive loans with little income verification and, often, no income verification, and finally no income at all.  When the appraisals were made, they often were insufficient to justify the loan, but with pressure from the realtors and lenders to make the deals happen, the appraisers got the message and appraised the subject property high enough to justify the loan.  If the interest rate was too high, the would-be borrower was steered to an adjustable-rate mortgage, offering an initial low starting rate, and no one worried about what would happen a few short years later when the loan dramatically adjusted upward to a more realistic rate, unfortunately beyond the borrowers' capability.  And, if that weren't enough, there were teaser rates, non-disclosure of key information such as a borrower's poor prior credit history, recent or even current unemployment, and so on. Surprisingly, lenders pushed these loans which we'll call sub-prime loans, but there were also other names, like toxic loans, liar's mortgages, Alt-A mortgages, unconventional loans, etc.

Normally these loans should not, and generally could not, have been sold by the lenders, as there should have been no market nor buyers.  Freddy Mac and Fannie Mae would not generally buy these loans, paying the proceeds back to the banks so that more of these unconventional loans could be offered by the banks to unqualified borrowers with plenty of profit to go around to all participants in the chain.  No, generally there had to be a market for these toxic loans but the conventional market knew better.  What was needed was (1) a

**secondary** market where these toxic loans could be packaged and sold as investments by investment banks like Lehman Brothers (2) a market that was **not regulated** and (3) **the willing participation of the rating agencies,** often referred to as the Gatekeepers, because their de facto role was to pass judgment on the risk aspects of investment bonds.  Without their high ratings the gate would remain closed and the public would be protected from worthless investments. It must be remembered that these investments, both mortgage-backed securities and corporate bonds (discussed later) are complex investments based on complex financial information—well beyond the expertise of the average investor. Much of the information necessary to determine a bond's creditworthiness   is not generally available to the public but is available to the rating agencies. In fact, in using Google and accessing Lexis-Nexis' database of 22 billion public documents there is no mention of plaintiffs' bonds except the required SEC filings.  Fortunately for the real estate industry, there was a secondary market for these toxic mortgage backed securities packaged by banks including Lehman Brothers, and fortunately for them the Government did not regulate this field.  All that was finally needed was a credible method to sell  these loans as investments.

And this is where the Gatekeepers entered the picture and made hundreds of thousands of dollars, being paid by the very banks they were rating! They crossed the line in their duty to the public and SOLD their valuable ratings to the investment banks including Lehman Brothers for hundreds of millions of dollars in exchange for applying high ratings to worthless and near-worthless toxic bonds.  Once the public saw an investment grade rating from one or more of these defendants on a bond, backed by a few to several thousand mortgages, the investing public jumped aboard.  **Had the Gatekeepers refused to sell themselves and their credibility and their ratings to legitimize these toxic loans, there would have been no secondary market, and without a secondary market, the subprime loans would never have created the perfect storm for the country's subsequent real estate collapse, followed by the economic collapse. The rating agencies abandoned their traditional role of alleged honesty, thoroughness, professionalism, and objectivity as**

1   claimed on their websites.  Because the rating agencies (the defendants herein) and their

2   clients, including Lehman Brothers, realized the extraordinary money to be earned over-

3   rating toxic debt they began aiding and abetting their clients by utilizing the ratings as

4   part of a marketing scheme to advertise and sell sub prime mortgage-backed

5   investments and they even participated with the investment banks, such as Lehman's, to

6   structure the investments to achieve more revenue by virtue of handing out unjustified

7   high ratings to achieve more sales and at  lower interest rates.

8

9        Roger Lowenstein, the author of The End Of Wall Street, an acknowledged expert on

10   economic and financial issues facing the U.S. , and a writer for the New York Times, wrote an

11   article on April 27, 2009 entitled:  "Triple-A Failure," and a portion of his somewhat lengthy

12   article is herein set forth:

13

14        In 1996, Thomas Friedman, the New York Times columnist, remarked on "The
         NewsHour With Jim Lehrer" that there were two superpowers in the world —
         the United States and Moody's bond-rating service — and it was sometimes

15        unclear which was more powerful.  Moody's was then a private company that
         rated corporate bonds, but it was, already, spreading its wings into the exotic

16        business of rating securities backed by pools of residential mortgages.

17        Obscure and dry-seeming as it was, this business offered a certain magic.  The
         magic consisted of turning risky mortgages into investments that would be

18        suitable for investors who would know nothing about the underlying loans.  To
         get why this is impressive, you have to think about all that determines whether

19        a mortgage is safe.  Who owns the property?  What is his or her income?
         Bundle hundreds of mortgages into a single security and the questions multiply;

20        no investor could begin to answer them.  But suppose the security had a
         rating.  If it were rated triple-A by a firm like Moody's, then the investor

21        could forget about the underlying mortgages.  He wouldn't need to know
         what properties were in the pool, only that the pool was triple-A — it was

22        just as safe, in theory, as other triple-A securities.

23        Over the last decade, Moody's and its two principal competitors, Standard &
         Poor's and Fitch, played this game to perfection — putting what amounted to

24        gold seals on mortgage securities that investors swept up with increasing élan.
         For the rating agencies, this business was extremely lucrative.  Their profits

25        surged, Moody's in particular:  it went public, saw its stock increase sixfold
         and its earnings grow by 900 percent.

26
27        By providing the mortgage industry with an entree to Wall Street, the agencies
         also transformed what had been among the sleepiest corners of finance.  No
         longer did mortgage banks have to wait 10 or 20 or 30 years to get their

28        money back from homeowners.  Now they sold their loans into securitized

**pools and — their capital thus replenished — wrote new loans at a much quicker pace.**

Mortgage volume surged; in 2006, it topped $2.5 trillion.  Also, many more mortgages were issued to risky subprime borrowers.  Almost all of those subprime loans ended up in securitized pools; indeed, the reason banks were willing to issue so many risky loans is that they could fob them off on Wall Street.

But who was evaluating these securities?  Who was passing judgment on the quality of the mortgages, on the equity behind them and on myriad other investment considerations?  Certainly not the investors.  They relied on a credit rating.

**Thus the agencies became the de facto watchdog over the mortgage industry.**  In a practical sense, it was Moody's and Standard & Poor's that set the credit standards that determined which loans Wall Street could repackage and, ultimately, which borrowers would qualify.  Effectively, they did the job that was expected of banks and government regulators.  And today, they are a central culprit in the mortgage bust, in which the total loss has been projected at $250 billion and possibly much more.  ...."

It should be noted here, and it is discussed below, that these so-called expert

analysts of  risk did not generally, if ever, have the individual loan files

before them, nor did they communicate with the borrowers to verify the

information they provided in their loan applications.  Why would this be the

case?  Because the Gate Keepers viewed themselves as infallible statisticians,

able to superimpose on thousands of borrowers their computer business models

developed before the flood of subprime loans and yet come up with the

likelihood of default of these borrowers for which they had little empirical

evidence.  And when their own analysts suggested that updated models were

desperately needed, they were told to rate the securities without updated

models

With the existence of a secondary market, no regulation, and very willing credit

rating agencies being paid hundreds of thousands of dollars to rate each bond by the

very companies they were rating,  overly-high and unjustified ratings resulted,

billions of dollars in sales of these investments occurred, and a real estate bubble

developed and grew and was just waiting to pop.  The proverbial pin that would pop the bubble had already been created: when the sub-prime adjustable rate mortgages came up for adjustment, thousands of foreseeable defaults began to occur.  Why weren't the Gatekeepers doing their job of honest analysis and down-grading when necessary?  Because they succumbed to GREED.

However this is only half the story.  The rating agencies had sold out to the issuers regarding the toxic sub-prime mortgage-backed bonds as explained above, but what of the corporate  bonds from these same issuer clients that needed to be rated and sold? Once the rating agencies had crossed the line and sold their  false ratings to the issuers of toxic bonds, it was an easy step to continue selling their false ratings of corporate bonds on behalf of their favored issuer clients.

Lehman Brothers failing  financial condition was known to many people in the financial community when the plaintiffs' bonds were allegedly being analyzed. (1) The accuracy of Lehman's financial statements were highly questionable and  many respected commentators following Wall Street news suspected that (2) Lehman's was stuck with massive amounts of unmovable toxic investments on their books substantially in excess of other competing investment banks, that (3)  Lehman's was overly leveraged at 44 to 1, well beyond the SEC guideline of not exceeding 12 to 1, that (4) certain substantial liabilities were not reflected in Lehman's financial statements and that (5) Lehman's was struggling to raise large amounts of capital to stave off a collapse.  **THE RATING AGENCIES KNEW OR SHOULD HAVE KNOWN WHAT OTHERS IN THIS FIELD KNEW AND SHOULD HAVE EITHER REFUSED TO RATE LEHMAN'S CORPORATE BONDS OR SHOULD HAVE ASSIGNED THE LOWEST RATING POSSIBLE TO REFLECT THEIR TRUE LOW VALUE. THE DEFENDANTS SHOULD ALSO HAVE DOWN-GRADED LEHMAN'S BONDS AS LEHMAN'S FINANCIAL CONDITION STEADILY DETERIORATED.  THEY CHOSE NOT TO.**

The plaintiffs, not being aware of Lehman's failing financial health and believing in the credibility and reputation of the rating agencies to professionally and honestly analyze and accurately rate the bonds they were considering, did in fact, purchase two corporate bonds carrying an Investment Grade rating from each of the defendants, one of which was issued by Lehman's just months prior to Lehman Brothers filing for bankruptcy!  The Grassis lost the value of their bonds and the income stream promised by these bonds on the order of $145,000.00.

## III.  Counts

**1. CLAIM FOR NEGLIGENT MISREPRESENTATION AGAINST THE DEFENDANTS (VARIOUSLY REFERRED TO HEREIN AS THE DEFENDANTS OR THE RATING AGENCIES)**

**A.** Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs, as if fully set forth herein.

**B. Acts constituting negligent misrepresentation (Note: this is a partial list as no analysts' reports of the defendants are available to the public as far as plaintiffs can determine):**

(1)  The defendants, and each of them, assigned materially false and misleading Investment Grade credit ratings  (ie the  ratings **are** the misrepresentations) to the bonds purchased by plaintiffs described below, wherein they knew or they should have known said representations to be false and misleading when they assigned investment grade ratings to bonds that were issued by Lehman's at a time when Lehman's  was in severe financial distress as explained above, below and herein.  Said financial conditions, including the assignment of bogus ratings which appeared in the prospectus of each bond,  and their failure to down-grade said bonds when and as

required, occurred at the time of issuance of the bonds and thereafter
and until Lehman's filed for bankruptcy.

(2)    At the time of said ratings neither of the two Lehman Bros.
bonds purchased by plaintiffs warranted an Investment Grade rating due
to the  failing financial condition of Lehman Brothers at the time of each
rating.

(3)    At the time of issuance of each of plaintiffs' bonds and thereafter
to the time of Lehman Brothers filing for bankruptcy in Sept. 2008, the
company's financial statements submitted to the SEC and elsewhere
reflected millions of dollars of toxic and unsellable assets and
unrealistically high valuations of several so-called assets on Lehman's
books including, but not limited to, the manipulation of Lehman's balance
sheet using accounting devises such as Repo 105 which had no
substantive value and was solely used to give the appearance of
reducing its leverage ratio.

(4)  Further, the rating agencies, and each of them,  also failed to
downgrade their previous ratings of plaintiffs' bonds by the first and
second quarter of 2008, if not earlier, when it became common
knowledge on Wall Street that Lehman Brothers was in an extremely
tenuous and declining financial condition and where there was little
reason to expect Lehman Brothers to survive and avoid bankruptcy. For
example, Lehman's took only a $200 million write-down on a $6.5 Billion
pool of CDOs (insurance bets against the possibility of default of
mortgage-backed securities) when the write-down should have been
substantially higher  and on the order of $2-3 billion dollars and not $200
million dollars.

(5)  Further, the defendants, and each of them,  either ignored or failed to
take into consideration in rating these bonds the unduly high and

extremely risky leverage of approx. 44 to 1 employed by Lehman's, well in excess of its competitors and in excess of the SEC guidelines. Leverage is a critical factor for an analyst to check, as an overly leveraged bank like Lehman's can not withstand even a moderate drop in the market place because it can push the bank into insolvency and precludes credit availability and further decreases liquidity.

(6) Further the defendants ignored or failed to take into consideration at the time of rating the plaintiffs' bonds the numerous questions being asked and numerous indications of financial irregularities present on Wall Street about Lehman's faulty financial statements, missing underwater assets, understated liabilities and over-valued assets. This missing information, which the rating agencies should have considered in its risk evaluation process, was available to them throughout 2004-2008 and was reflected in part in the quarterly and annual financial statements filed with the SEC. Plus, at all times herein, the rating agencies were able to request and receive additional financial information it needed from their client Lehman Brothers.

(7) Defendants, and each of them, at the time they rated plaintiffs' bonds through the date Lehman's filed for bankruptcy, ignored or failed to consider that Lehman Bros. was carrying its assets at so called "fair value" even though their actual values had dropped considerably (by as much as 50%) and Lehman's should have been carrying said assets at notional value which would have been based on near distress sale prices. Had the defendants valued the assets at their true distressed values, they could not and should not have assigned the Investment Grade ratings they assigned to plaintiffs' bonds.

(8) Defendants, and each of them, did not, upon information and belief, even examine the mortgages supporting the bonds they were rating to

determine their likelihood of default; rather the defendants used outmoded models based on mortgage default data from the 1990s and first one or two years of 2000. Had they examined the mortgages themselves and the loan applications, they would have discovered that the majority of loans were to borrowers with inadequate or no incomes who were expected to pay for the subject loans, and they would have discovered other borrowers who had not paid even 10% down as part of their purchase.

(9)  Defendants, and each of them,  at the time of rating plaintiffs' bonds, failed to note in their analysis, or failed to  find in their investigation that Lehman Bros. was having increased difficulty with its counter-parties and in obtaining credit especially by the 1st quarter of 2008.

(10) Defendants, and each of them,  at the time of rating plaintiffs' bonds, ignored or failed to require Lehman Bros. to increase its collateral to justify the investment grade rating Lehman's insisted upon and which the defendants awarded to the Plaintiffs' bonds. Said increase should have been a condition precedent for an Investment Grade rating on the subject bonds and had the rating agencies insisted upon adequate increased capital, plaintiffs' bonds would have been  secure.

(11)  Defendants, and each of them, at the time they rated plaintiffs' bonds, ignored or failed to recognize, consider and build into their evaluation Lehman Bros.' rapidly deteriorating financial condition and lack of credit availability.  Said failure thereby ignored Lehman's ability to continue issuing debt without appropriate capital requirements in place and thereby go deeper into debt and thereby further jeopardize the risk of default of plaintiffs' bonds.  Had the rating agencies insisted upon adequate increased capital, plaintiffs' bonds would have been secure.

(12) Defendants, and each of them, at the time of rating plaintiffs' bonds,

[TITLE OF DOCUMENT]
Case No. CV-00543-JAM-DAD

failed to reasonably and conspicuously disclose to the public and to plaintiffs the conflict of interest they were in with Lehman's, whose bonds they were rating at the same time being paid by Lehman's, who was paying them extraordinary fees for the highest rating possible. In fact, defendants succumbed to the opportunity of over-rating plaintiffs' bonds for high fees as opposed to assigning a low rating and protecting plaintiffs and other bond investors from purchasing and holding worthless bonds. As the SEC noted: "the conflict of interest inherent in this model is that rating agencies have an interest in generating business from the firms that seek the ratings, which could conflict with providing ratings of integrity".

(13)  The defendants, and each of them, lacked the manpower to complete a professional analysis of the risks inherent in the subject bonds, especially given their complexity and given the high volume of bonds they were being asked to rate on a weekly basis.

(14)  The defendants, and each of them,  ignored or failed to consider in their risk analysis the rapidly escalating defaults of the subprime backed securities which by 2004 clashed with the outdated business models then in use by the defendants which were based on the lower default rates pre 2003 involving mostly traditional loans with 10-20% down and qualified borrowers.

(15)  The defendants, and each of them, as was there habit and custom, ignored the evidence of risk lurking lurking in Lehman's financial statements and which represented the financial basis for plaintiffs' bonds and their ratings.  Evidence of said habit and custom is set forth in the numerous emails submitted to the House Oversight Committee on Oct. 22, 2008 and examples of same are excerpted and set forth in Plaintiffs' Opposition to Defendants' (First) Motion to Dismiss, between pages 35-

40 and the Court is asked to take Judicial Notice of said public records.

**C. Privity**:  These false and misleading ratings were communicated by the defendants, and each of them,  to the public, of which plaintiffs were members, and to brokerage houses throughout the United States, including to plaintiffs' brokers Stone and Youngberg in San Francisco knowing that the brokers employed at these brokerage houses would both rely on these ratings and foreseeably communicate these ratings to their clients, including plaintiffs herein.

Defendants each knew their ratings would provide an assurance as to the  creditworthiness  of Lehman Bros., information the investors including plaintiffs needed before making their investment decision. Accordingly, these ratings were in reality for the specific benefit and guidance of the conservative bond investors, including plaintiffs,  whom the rating agencies and Lehman Brothers had targeted as likely purchasers of these particular  bonds.

Therefore, in reality, the rating agencies were each communicating their false ratings to plaintiffs via plaintiffs' agents, the investment  brokers, thereby creating privity and a business and fiduciary relationship  and duty between themselves and plaintiffs. Defendants understood and intended that their ratings would be communicated to the brokers who in turn would communicate said ratings to their clients, including plaintiffs herein. Defendants also published their ratings on their respective web sites and in various financial journals removing any doubt that they were not intending to influence the conservative bond investing public, including plaintiffs.

Not only was this arrangement and the effect it would have on plaintiffs entirely foreseeable but in fact was created and perpetuated

by the rating agencies to accomplish this exact goal. This was done for the sole purpose of inducing plaintiffs and those similarly situated to buy the subject over-rated bonds by the rating agencies. Defendants were not, nor are they now, compelled to publish their ratings, false as they may be. Rather they affirmatively have chosen to so publish with the expectation that more investors will be persuaded and induced by overly high and false ratings to purchase the bonds they've rated. This plan would thereby insure that the rating agencies' client  Lehman Brothers would be all the more appreciative and continue to employ the services of the rating agencies, allowing the rating agencies to continue to earn several hundred thousand dollars for each bond rating.

These misleading and false ratings offered no useful information to the public but rather constituted misleading and false advertising, causing the loss of thousands of dollars to plaintiffs.

**D.  Scienter**:  The defendants, and each of them herein, knew at all times that their ratings were either erroneous or outright false and misleading and they further knew the potential investors, looking for safe investment grade bonds, would be apprised of the subject ratings from their brokers and from information easily available on the internet, in financial magazines and newspapers and would rely on said false and misleading ratings when  they made their investment decisions. Said bogus ratings were made for the sole purposes of aiding  Lehman Brothers in the sale of these over-priced and toxic bonds which were necessary to shore up Lehman's faltering financial condition, and for the defendants to  earn hundreds of thousands of dollars in fees for said bogus ratings.

**E.  Specific targeted group**:  The defendants, and each of them,

targeted a specific and limited class of investors; those looking for safe investment grade corporate bonds, bonds issued from investment banks that were not likely to fail and would pay to maturity all that was promised under the terms of the bonds.  This limited group was searching for safe corporate bonds  paying a modest rate of return as opposed to stocks, real estate, antiques, collectables, etc. that might be expected to yield a much higher return but at a greater risk of default. This specific group was a limited targeted group where safety and preservation of capital were the primary goals and the rating agencies reached out to them specifically.

The defendants knew that their ratings would be communicated to investors searching for safe investment grade bonds and therefore intended that their ratings would be for the benefit and guidance of this specific and limited targeted group and said ratings would factor into their purchase decisions.

**F.  Reasonable Reliance:**  The defendants, and each of them, knew that the targeted and limited group of conservative bond investors, including plaintiffs herein, would rely on the defendants' ratings in making their purchasing decisions involving thousands of dollars. This was so  because the targeted group had no realistic alternative due to the complexity of the subject bonds, the cost to an investor if he or she decided to retain the services of an outside valuation firm to value said bonds and their risk of default, and the availability of information to the rating agencies not available to the average investor.  In that the rating agencies were being paid a few to several hundred thousand dollars to review a bond and rate same, it would make no sense for an investor purchasing for example a $20,000 bond, as plaintiffs did, to pay an outside firm say $100,000 to rate the

same bond, especially as said bond was already rated for free and
available to the public in the newspaper, the internet or from one's
broker. Further, the rating agencies claimed their ratings were being
made after careful, professional, objective, thorough and honest
examination of extensive and complex financial records (of Lehman's
in this case) and that they concluded Lehman's deserved the
investment grade rating. It was clearly understood by defendants that
the purpose of issuing the ratings was to induce reliance on said
ratings by plaintiffs and that said plaintiffs and members of the
specially targeted group would rely and act based upon those ratings.

G. **Duty owed to plaintiffs**: The defendants herein, and each of
them, had a duty to publish accurate information to the public and to
the limited and targeted group of conservative bond investors of
which plaintiffs were members because (1) they, and each of them,
knew that members of this targeted group would be apprised of these
ratings, and would rely on the accuracy of these ratings in making
their investment decisions. In fact, the rating agencies, and each of
them, along with Lehman's, went to great lengths to insure their
ratings would be relied upon by plaintiffs, promulgating literature and
otherwise advertising on the internet and elsewhere that their service
of reviewing bonds about to be issued would be honest, objective,
thorough  and professional.  Said campaign of insuring reliance
included the creation of a website for each rating agency touting their
expertise, honesty, professionalism and objectivity and stating they
offer a valuable service to investors…to produce honest and accurate
ratings to guide investors including plaintiffs herein.  By virtue of the
facts herein and above, the defendants were not independent
analysts but rather were assisting Lehman's in advertising and

selling bogus securities while at the same time representing to the public their role as neutral, professional and objective analysts.  The defendants, and each of them, were aware not just of the possibility of their ratings being read and relied upon by conservative bond-seeking investors including plaintiffs, but in fact were partners with Lehman's in a marketing plan which had as its sole purpose reaching out to this investment segment, of which plaintiffs were a member, and advertising these bonds and  influencing their investment decision to buy the subject bonds. The defendants breached their duty owed to plaintiffs.

H. **Downgrading duty**: These same rating agencies also represented to the public, including plaintiffs as part of the public, that they would monitor the companies whose bonds they had rated, and provide updated information and adjust ratings over time, if and as warranted in their professional opinion. The rating agencies failed to do so in connection with these bonds prior to Lehman's bankruptcy.

I. **Reliance and purchase**:  Plaintiffs, a part of the limited and targeted group of conservative bond investors herein did in fact rely on said ratings promulgated by the defendants and each of them,  to their detriment and as a result of said reliance did, in fact purchase two Lehman Bros. bonds, one identified as Cusip # 52517PYH8 issued 2/27/08 and rated A1 by Moody's, A+ by S & P (now owned by McGraw) and AA-1 by Fitch and the other as Cusip # 5252MOCV7 issued 1/6/04 and rated A1 by Moody's, A by S & P, and A+ by Fitch.   Said reliance was reasonable as explained above and due to the highly complex nature of Lehman's financial statements and due to the prohibitive cost of employing an outside analyst at a cost of tens of thousands of dollars to review the risk of

purchasing a $20,000 bond.

**J.  Injury to plaintiffs**:  Said bonds became worthless when Lehman
Brothers filed for bankruptcy in Sept., 2008. Said loss including
principal and promised income was approx. $145,000

**K.  Reliance caused injury**:  Plaintiffs would not have purchase
these bonds had the rating agencies correctly, professionally,
thoroughly,  and objectively rated these bonds as they represented
and  promised.

**2.  CLAIM FOR INTENTIONAL MISREPRESENTATION
AGAINST THE DEFENDANTS (VARIOUSLY REFERRED TO
HEREIN AS THE DEFENDANTS OR THE RATING AGENCIES)**

**A.**  Plaintiffs repeat and re-allege all of the allegations set forth in the preceding
paragraphs inclusive as if fully set forth herein.

**B.**  On or about the dates each of plaintiffs' bonds were issued, as set forth
above, the defendants, and each of them, issued ratings which were meant to
indicate the risk or likelihood of default of plaintiffs bonds.  All three
defendants indicated that the subject corporate bonds of Lehman Brothers
were of investment grade meaning the risk of default was slight (ie low
credit risk Investment Grade).

**C.**  Defendants represented to the public, on an ongoing basis as explained
above,  that these ratings were the result of their diligent , professional,
honest and objective analysis of financial records of  the companies they
were rating, including Lehman Brothers.

**D.**  However the subject ratings were not done diligently, professionally,
honestly and/or objectively, but rather were done, on information and
belief, knowingly or recklessly and  pursuant to a marketing
arrangement, either express or implied,  with Lehman Brothers.

Specifically Lehman Brothers required as high a rating as possible for its bonds, including the subject bonds, in order to successfully sell said bonds, and to do so at the lowest interest rate possible; the rating agencies in turn desired to rate as many bonds as possible, including the subject bonds, in order to receive on going fees of several thousand dollars for each rating.  As explained above the rating agencies and Lehman Brothers had already  successfully worked together in over-rating mortgage-backed securities in order to sell  them to the unsuspecting public and therefore it was not a difficult step for the defendants to over-rate Lehman Brothers corporate bonds and the rating agencies took that step.

    To accomplish this goal, the rating agencies had to, and did,  again abandon their responsibility of honestly, diligently and professionally reviewing the underlying financial records and other available information about Lehman Brothers and instead issued whatever rating was needed to successfully advertise and sell the bonds at the lowest interest rate and that meant assigning an unwarranted and false rating.

**E.**  These ratings were false and not supported by the underlying financial information available and were known to be false and unsupported by the agencies.  In addition the rating agencies had succumbed to a conflict of interest  as described above between themselves and Lehman Brothers which was paying them to rate Lehman Brothers bonds.  In essence the dying patient was offering to pay the doctor a premium if he could receive a clean bill of health. The defendants readily agreed to this arrangement.

**F.**  These ratings which were false and misleading , were made with the intent by the rating agencies to induce the public, including plaintiffs herein, to purchase these over-rated bonds so that the agencies could

reap their substantial fees and their client, Lehman Brothers could sell these worthless bonds and delay Lehman Brothers ultimate day of financial reckoning.  Plaintiffs did in fact rely on defendants' ratings.

**G.**  The plaintiffs, at the time of these misrepresentations and at the time of purchasing and thereafter holding these bonds, were unaware of the true facts nor were they realistically able to ascertain the true facts due to the complexity of the financial information and the cost of independently ascertaining the truth.  The subject bonds were $20,000 each and the rating agencies charged, on information and belief, in excess of tens of thousands of dollars to rate a  corporate bond from Lehman's.

**H.**  Lehman Brothers filed for bankruptcy in Sept. 2008 rendering the subject bonds worthless

**I.**  As a result of said purchases by plaintiffs, the plaintiffs were damaged by defendants in the sum of approx. $145,000 (the face value of their bonds and the estimated stream of income promised but not received)

**J.**  By virtue of the defendants' intentional and tortious misconduct, as explained above, plaintiffs are entitled to punitive damages in a sum to be determined at trial.

## 3.  CLAIM FOR AIDING AND ABETTING AGAINST THE DEFENDANTS (VARIOUSLY REFERRED TO HEREIN AS RATINGS AGENCIES OR DEFENDANTS)

**A.**  Plaintiffs repeat and re-allege all of the allegations set forth in the preceding  paragraphs inclusive, as if fully set forth herein.

**B.**  Each party participated in a plan to advertise and sell over-rated and false ratings to bonds to the public including plaintiffs herein, which bonds were issued by Lehman Brothers.  Pursuant to said arrangement Lehman Brothers

[TITLE OF DOCUMENT]
Case No. CV-00543-JAM-DAD

benefited by selling bonds it knew were worthless or of little value for the reasons set forth above.  Knowing said bonds were worthless, Lehman's sought high credit ratings from the rating agencies to carry out its plan to sell these worthless bonds to unsuspecting investors including plaintiffs it might not otherwise have been able to sell and thereby received millions of dollars.  The defendants , in turn, benefited by receiving  thousands of dollars in fees for helping to sell worthless bonds to plaintiffs by issuing false ratings. Without the help of the defendants, Lehman's would not have been able to carry out its fraud on investors including plaintiffs herein. The defendants knew, or should have known,  the bonds were worthless or of little value as explained above, as they had examined the underlying financial condition supporting those bonds and knew Lehman's was over leveraged and in serious financial straights as explained above. Defendants are therefore liable to plaintiffs for aiding and abetting Lehman's in selling worthless bonds to plaintiffs and causing damage to plaintiffs.

**C.** Plaintiffs were persuaded to purchase said bonds as explained above, their reliance on the defendants' misrepresentations was reasonable all as explained above, and the plaintiffs as a proximate result of said misconduct, sustained damages of approx. $145,000.

## PRAYER FOR RELIEF

**Wherefore, plaintiffs pray for relief and  judgment against the defendants, and each of them, as follows:**

**1.  Awarding compensatory and punitive damages in favor of plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount proven at trial, including**

[TITLE OF DOCUMENT]
Case No. CV-00543-JAM-DAD

interest thereon.

2.  **Awarding plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees.**

3.  **Awarding such additional equitable or other relief as deemed appropriate by the Court.**

4.  **Allowing plaintiffs to promptly commence discovery as previously requested.**

**Jury Demand:  Plaintiffs hereby demand a trial by jury.**

**Ronald and Sally Grassi**

DATED:  **April 8, 2010**                    /s/ Ronald and Sally Grassi