1   RONALD M. GRASSI,
    SALLY M. GRASSI
2   P. O. Box 6961
    Tahoe City, CA 96145
3   Telephone:  (530) 583-3105
    Email:  ronsallygrassi@mac.com
4

5   Plaintiffs, In Pro Per

6

7                    UNITED STATES DISTRICT COURT

8        EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

9   RONALD M. GRASSI and                    Case No.:  2:09 CV-00543-JAM-DAD
    SALLY GRASSI,
10

11                  Plaintiffs,             **PLAINTIFFS' OPPOSITION
                                            TO DEFENDANTS' JOINT
12       -  vs -                            MOTION TO DISMISS
         -                                  PLAINTIFFS' FIRST
13   MOODY'S INVESTORS SERVICE, INC.        AMENDED COMPLAINT**
    ("MOODY'S"), THE McGRAW-HILL
14   COMPANIES, INC. ("McGRAW-HILL")
    AND FITCH, INC. ("FITCH"),
15                                          **DATE: JULY 9, 2010
                                            TIME:  10:00 AM
16   ,                                      PLACE:  COURTROOM 27
                    Defendants.             JUDGE:  HON. DALE A. DROZD**
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

**PRELIMINARY COMMENTS**............................................................. **5**

**RESPONSE TO DEFENDANTS' INTRODUCTION**.......................... **12**

**STANDARD OF REVIEW**............................................................. **12**

**RESPONSE TO ARGUMENTS BY DEFENDANTS**...........................**13**

    **1.  DUTY OF CARE**................................................................. **13**

    **11.  RESPONSE RE: ADDITIONAL ELEMENTS CONTENTION..23**

    **111.  CLAIM OF MISSING FRAUD ELEMENTS**.......................... **27**

    **1V.  FIRST AMENDMENT DOES NOT PROTECT THESE
RATINGS**........................................................................... **30**

        **A.  THESE RATINGS ARE NOT PROTECTED OPINIONS**

        **B.  ACTUAL MALICE/RECKLESS DISREGARD ARE PLED**

**V.  AIDING AND ABETTING IS PROPERLY PLED**.......................... **41**

**CONCLUSION**.............................................................................**44**

# TABLE OF AUTHORITIES

## CASES

Bily v. Arthur Young & Co., 3 Cal. 4th 370 (1992)……………………………………… 13-18

Nutmeg Sec. v. McGladrey & Pullen, 92 Cal. App. 4th 1435 (2001)……………....................14

Simpson v. Specialty Retail Concepts, Inc., 908 F. Supp 323 (1995)…………………..…14-15

Guenther, et al v.Cooper Life Sciences, Inc. et al, 759 F. Supp. 1437 (1990)…………….18-19

Anderson v. Deloitte & Touche, LLP, 56 Cal App 4th 1468………………………………..20-23

In re Fitch, 330 R. 3d 104 (2nd Cir. 2003)…………………………………………….……31-32

Abu Dhabi Commercial Bank, et al v. Morgan Stanley, et al (2009)
651 Supp 2nd 155…………………………………………………………….…..32-34, 41-42

Hoffman v. Capital Cities/ABC Inc., et al 251 F 3d 1180……………………………   34-36

Jefferson County Schools District v. Moody's Investor's Services, Inc.
175 F. 3d 848 (10th Cir. 1999)………………………………………………………..…36-38

Unelko Co. v. Ohlhausen 912 F 2d 1049………………………………………………37-38

County of Orange v. Mc Graw Hill Cos., 245 B.R. 151 (C.D. Cal. 1999)………………  38-39

## RULES

Fed. R. Civ. P.
9(b)……………………………………………………………………………………….... 7

## ADDITIONAL AUTHORITY AND SOURCES

Restatement (Second) of Torts (1997)…………………………………………………19-20

U.S. Senate Permanent Subcommittee on Investigations dealing with
The Financial Crisis:  the Role of the Rating Agencies (4/23/10)…………………………8-9

U.S. House Oversight Committee, "Credit Rating Agencies and the Financial ……………7-8
Crisis" (Oct. 22, 2008

Wikipedia(Wikipedia.org)……………………………………………………….………24-25

To Big To Fail, Andrew Sorkin,
(2009)………………………………………………………………………………   ..…..10

The Big Short, Michael Lewis
(2010)………………………………………………………………………………………10

---

1

A Colossal Failure of Common Sense
(2009)...............................................................................................................11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RONALD M. GRASSI,
SALLY M. GRASSI
P. O. Box 6961
Tahoe City, CA 96145
Telephone:  (530) 583-3105
Email:  ronsallygrassi@mac.com

Plaintiffs, In Pro Per

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| RONALD M. GRASSI and SALLY GRASSI,<br><br>Plaintiffs,<br><br>- vs -<br><br>MOODY'S INVESTOR'S SERVICES, Inc., ("MOODY'S"), THE McGRAW-HILL COMPANIES,INC. ("McGRAW-HILL") AND FITCH INC. ("FITCH"),<br><br>Defendants. | Case No.: 2:09 CV-00543-JAM-DAD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Date: July 9, 2010<br>Time:  10:00 am<br>Place:  Courtroom 27<br>Judge:  Hon. Dale A. Drozd |

**PRELIMINARY COMMENTS**

**1. Questions of fact should not be debated nor resolved in a Motion to Dismiss**

Several points raised by Defendants raise questions of fact and are therefore beyond

the scope of this motion. Both the Duty issue and First Amendment issue depend

significantly on a resolution of certain questions of fact as noted below.

**2. Satisfying the Plausibility Test can be an elusive challenge: something more than "conceivable"  but less than  "probable".**

Plaintiffs believe that Defendants demand more proof than is required at this stage, but

to insure a denial of the subject motion, Plaintiffs have set forth in this Opposition and

5

in the plaintiffs' proposed Second Amended Complaint (SAC) attached to the Declaration of Ronald Grassi further proof and have re-formatted certain allegations to support plaintiffs' claims. It is hoped that Defendants' frequent sweeping statements that Plaintiffs offer no proof in support of one issue or another, or their remarks that plaintiffs can not offer any proof of this or that issue, etc. will be taken in stride by the Court as it reviews Plaintiffs' First Amended Complaint (hereafter "FAC"), Plaintiffs' Opposition and, if the Court deems it necessary, Plaintiffs' proposed Second Amended Complaint. Just saying "plaintiffs offer no proof" or 'plaintiffs can not allege' this or that does not make it so.

3. **Common sense**: Defendants, for obvious reasons, intentionally obscure the true nature and inter-play of the ratings as they relate to the issuer and to the public in order to seek refuge behind previous favorable Court rulings. There is a reason why ratings are published and it is not to offer a protected opinion to inform the issuer how it is doing financially, but rather and solely to target and convince, via its "rating" as an advertizing tool, potential bond investors to buy the issuer's bonds.

The ratings are only for the bond-investing public and for the sole purpose of inducing them to buy the rated bonds of the rating companies' client, in this case, Lehman Brothers. The issuer has only one interest in the ratings: it wants and pays for the highest rating it can get to achieve as low an interest rate to be paid out as possible and it then publishes the rating, targeting only one group: potential bond investors. The issuer has no interest in the universe of potential stock investors, real estate investors, commodities investors, etc.; just bond investors.

3. **No pre-emption:**  As Federal law does not pre-empt state common law negligence, fraud and aiding and abetting claims, it is rather contradictory that plaintiffs, as argued by defendants, must either plead to the much higher Federal standards of Rule 9 (b) or have their case dismissed. Isn't this a subtle form of pre-emption?  The defendants did not move this case to the Federal Court due to diversity (state courts deal with non-resident defendants all the time); they moved it to the Federal court due to the additionally difficult burden of pleading and proof facing a plaintiff suing in tort if they could convince a Federal Court to impose Rule 9 (b) on plaintiffs.  Plaintiffs did not consent to this removal and, in fact, filed (unsuccessfully) a motion to remand their case to the state court in order to pursue their solely state common law claims.

4. **Circumstantial Evidence:**  Given the reality that plaintiffs' bonds weren't signed by the analyst reviewing same, it is impossible to supply the specific "who" (who determined the specific rating of plaintiffs' bonds)  except to name the 3 employers;  the "what", where, and when are alleged.  In fraud cases in particular, the additional details and understandings between two parties to a scheme to take advantage of a group of investors more often than not are not known by anyone except the 2 parties, nor is their understanding and intent published to the world.  Hence Circumstantial Evidence should be given additional weight in a case like this.  For this reason, Plaintiffs devoted a substantial portion of their First Opposition filed 7/2/09 to this issue and the Court is asked to review same as it reviews Plaintiffs' FAC and Defendants' arguments.  Plaintiffs quoted extensively from emails and testimony disclosed by the House Committee Investigation on Oct. 22, 2008 concerning the defendants' misconduct during the

time period that plaintiffs' bonds were issued.

Even more recent important testimony from the U.S. Senate Permanent Subcommittee on Investigations dealing with "Wall Street and the Financial Crisis: The Role of the Credit rating Agencies on 4/23/10 has been produced and portions are  set forth below and can be viewed in its entirety at http://hsgac.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=5f127126-608a-4802-ba77-d1bdffdfbe9b:

   a. Senator Carl Levin: "
        For a hundred years, Main Street investors trusted U.S. credit rating agencies to guide them toward safe investments. Even sophisticated investors, like pension funds, municipalities, insurance companies, and university endowments, have relied on credit ratings to protect them from Wall Street excesses and distinguish between safe and risky investments…

[This quote goes to the issue of plaintiffs' reasonable reliance]

    Looking back, if any single event can be identified as the immediate trigger of the 2008 financial crisis, my vote would be for the mass downgrades starting in July 2007, when the credit rating agencies realized their AAA ratings wouldn't hold and finally stopped labeling toxic mortgages as safe investments. Those mass downgrades hit the markets like a hammer, making it clear the investment grade ratings had been a colossal mistake.

 [This quote goes to the issue of Lehman's inability to dispose of the toxic assets on its balance sheets after July 2007, something the defendants' analysts should have noted, or did not spot but should have and adjusted their ratings accordingly]

    This chart, Exhibit 1i, shows just how big a mistake it was. It shows that 91% of the AAA subprime RMBS securities issued in 2007, and 93% of those issued in 2006, have since been downgraded to junk status…

    The documents also show how the crushing volume of ratings undermined the ratings process. Despite record profits, both credit rating agencies were understaffed and overwhelmed with complex deals that investment bankers wanted to close within days. The documents show how investment bankers argued with the credit rating analysts, substituted worse assets at the last minute, and pressured analysts to waive their procedures and standards. We even saw instances of bankers pushing to remove analysts who were not playing ball. At times, analysts who resisted banker demands or challenged ratings were restricted from deals.  (emphasis added) (The above testimony is taken from Sen. Levin's Opening Statement, P.1-6)

    [This quote supports plaintiffs' contention that the defendants were under-staffed and could likely not have performed an adequate or any investigation of a bond's risk of default

including plaintiffs' bonds and were under constant pressure to over-rate bonds]

b. Eric Kolchinsky, former managing director in charge of the business line rating sub-prime backed CDOs at Moody's (part of the assets on Lehman's Financial Statements), discussed the lack of hard evidence available:

"As a former head of compliance testified, Moody's had an unofficial policy of never committing controversial items to paper or email. Instead, people were encouraged to walk over and have a conversation or to have a conference call. However, because of its importance, market share information was an exception.

[This quote confirms why in part it is difficult to obtain hard evidence on many issues such as the specific facts surrounding plaintiffs' bonds]

c. Raymond McDaniel, CEO of Moody's at Moody's Town Hall Meeting, Sept. 10, 2007 (this quote is part of Ex. 1b of the Senate packet):"our competition, Fitch and S & P went nuts. Everything was investment grade. It didn't really matter"

[This quote suggests the misuse of Investment Grade ratings by at least 2 of the defendants in this case, which ratings apply to plaintiffs' bonds]

Note to Court: By now thousands of emails, and hundreds of transcripts are in the public

domain generally discussing the sub-prime debacle and confirming that greed at the rating

agencies overcame professional analysis, and that the analysts and CEOs of the rating

agencies knew what was wrong with the structured investments they were rating, but they

played along, no longer serving the public with accurate information. Plaintiffs can bring

piles of these emails and transcripts to court, but why??  First, this is a motion to dismiss,

not a trial. Second, is there really any doubt at this point in time that the rating agencies

were over-rating bonds for fees, and the public lost millions of dollars in the process??  It's

rather ironic that the analysts saw, if they even looked at Lehmans' balance sheets,

millions of dollars of worthless structured assets that, with only a few exceptions,  couldn't

be sold to anyone after approx. July of 2007.  Lehman's was dying and its rapidly-

declining health was reflected in its financial statements, the same statements the analysts

were supposed to professionally, honestly and objectively analyze and rate.

(d)  Numerous books have been written on the rating agencies, Lehman's,  and the

role the rating agencies played in the country's real estate and stock market collapse, and offer dozens of insights surrounding the time period when plaintiffs' '04 and '08 bonds were rated, and the '07-Sept '08 period when plaintiffs' bonds should have been down-graded.

    (1)  For example, in <u>Too Big to Fail</u>, by Andrew Sorkin, when describing Treasury Secretary Paulson's concern about the financial health of Lehman's 3 days after the Bear Stearns collapse and the possibility that Lehman's might be the next to fail, Mr. Paulson stated on March 27, 2008:

<u>"They (Lehman's) may be insolvent, too"</u> . Paulsen went on to state he was worried not only about Lehman's wildly optimistic and over-valued assets, but also Lehman's failure to raise ANY capital-not a sent. (P. 51 of <u>Too Big To Fail).</u>  These overly-high valued assets and lack of capital are some of the key points cited by plaintiffs indicating defendants' negligence or fraud in their analysis and rating of Lehman Bros. bonds sold to plaintiffs.

Note that plaintiffs' 2nd bond was issued on Feb. 27th, 2008 by an investment bank judged one month later by the US Sec. of the Treasury as possibly insolvent.  Not only should the 2nd bond have been rated much lower (at whatever level equates to possible insolvency of an issuer), but the first bond ('04) should have been downgraded by Feb. of '08 if not soon after July '07 when the market for Lehman's toxic assets began drying up.

On the issue of defendants' claim they didn't see the sub-prime mortgage crisis unfolding until it was too late to adjust their ratings, see <u>The Big Short</u>, by Michael Lewis where, at P. 59, he describes one of the subjects of his book, Mike Burry, who in <u>Oct. of '05</u> (not '06. '07 or '08) noted: "The next morning, Burry opened the Wall Street Journal to find an article explaining how the new wave of adjustable-rate mortgages were defaulting, in their first nine months, at rates never before seen".  Why are Plaintiffs citing this? Because the rating agencies had already rated plaintiffs' '04, and knew (if they read the <u>Journal</u>, for example) that their ratings and modeling were wrong and that the ;04 bond had to be down-graded. Further these defendants saw these earlier-issued bonds and

similar investments (assets)  on Lehman's balance sheet when analyzing Lehman's corporate bonds, and yet somehow …came up with an Investment Grade rating on plaintiffs' bonds! This is beyond credibility.

On the issue of leverage, which is the first thing the analysts should have been looking at, they should have seen if they even casually reviewed Lehman's financial statements in '08,  a leverage ratio of at least 30 to one, although several writers say it was 44 to one. For example, see A Colossal Failure of Common Sense, the Inside Story of the Collapse of Lehman Brothers, by Lawrence Mc Donald, former vice-president of Lehman Brothers, where he quotes David Einhorn, President of Greenlight Capital and one of the most quoted  Wall Street commentators, at P. 287:  "I estimate Lehman's ratio of assets to real tangible common equity to have reached 44 times" (ie, 44 to 1).  That meant that with only $17 billion of real capital, Lehmans had leveraged itself to acquire $748 Billion in asset risk. As will be made more clear at trial, Lehmans was either the most leveraged or 2nd most leveraged bank on Wall Street as Wall Street was imploding in '07 and early '08. And the rating agencies, examining this incredibly excessive leverage (per Einhorn, McDonald) and the wildly over-valued assets (per Paulson) on Lehman's books, came up with… Investment Grade!?

5. **Leave to amend:**  If the numerous and specific facts added to Plaintiffs' FAC are judged by the court to still be insufficient, plaintiffs can and will add more facts and specific allegations as set forth in this Opposition and have done so in their proposed SAC attached to the declaration of Ronald Grassi.  The Court is also asked to allow for a reasonable amount of leeway if a further amendment is necessary as it is more difficult for a party in pro per to gauge just how much evidence, specific facts and allegations are necessary to push the matter over the line from "conceivable" to "plausible".  Were there a "bright line" to guide

[TITLE OF DOCUMENT]
Case No. CV-00543-JAM-DAD

plaintiffs, the task would be easier.

## RESPONSE TO DEFENDANTS' INTRODUCTION

Plaintiffs have, in their FAC, pled facts and set forth specific allegations, and done so with particularity. Rather than re-plead the facts and points here, the Court's attention is directed to all of the facts and points set forth in the Background section of Plaintiffs' FAC  (P.3-8 and which are <u>expressly incorporated</u> into each of plaintiffs' Counts by reference) as well as the detailed facts and allegations set forth in support of each of Plaintiffs' 3 counts starting at P. 8  of Plaintiffs' FAC, many of which are discussed below.

## STANDARD OF REVIEW

Plaintiffs would add to defendants' discussion of Standard of Review that the Court should exercise its judicial experience and "common sense" (dozens of citations unnecessary and omitted). For example, in a case involving an alleged marketing scheme and fraudulent misconduct, not every element of the claim can be expected to be documented and available to the public.  For example, in a search of all public records in the huge Lexis-Nexis data base, as well as using Google's powerful search engine, there is no mention of plaintiffs' bonds, nor whether Plaintiffs' bonds were even analyzed, and if so by whom and when. The court can and should therefore consider circumstantial evidence  of past consistent  misconduct by these parties involving their rating misconduct as brought forward by the U.S. House Oversight Committee of Oct. 22, 2008, much of which is described in Plaintiffs' First Opposition to defendants' first motion to dismiss (hereafter "First Opposition") at P. 35-40 as well as set forth in the  Declaration of  Ronald Grassi of 7/2/09 attached to the First Opposition which

sets forth several emails and testimony from rating agency employees and testimony

concerning the rating agencies and their misconduct. Further evidence of consistent

misconduct by the rating agencies and their analysts, going to the issue of habit and custom, is

set forth above and was derived from the recent U. S. Senate Sub-committee on Investigations

conducted by Senator Carl Levin in April 23, 2010.

## RESPONSE TO ARGUMENT BY DEFENDANTS

## 1.  DUTY OF CARE

Applying California law, which should apply here as California has the most contacts with

this transaction as explained in Plaintiffs' First Opposition  at P. 14-15, we need to discuss

principally <u>Bily</u> v. <u>Arthur</u> <u>Young</u> & <u>Co.,</u> 3 Cal. 4th 370 (1992) (hereafter <u>Bily)</u>, <u>Guenther</u> et <u>al</u>

v. <u>Cooper</u> <u>Life</u> <u>Sciences,</u> <u>Inc</u> et <u>al</u> 759 F. Supp. 1437 (1990) (<u>hereafter</u> <u>Guenther)</u>,  <u>Anderson</u> v.

<u>Deloitte</u> & <u>Touche,</u> <u>LLP</u>, 56 Cal App 4th 1468, and the <u>Restatement</u> <u>of</u> <u>Law,</u> <u>Second,</u> <u>Torts,</u>

Sec. 552 (hereafter the <u>Restatement)</u>.

### a. <u>Bily</u>

**<u>First</u>**, <u>Bily</u> may not be controlling as it involved a claim under the Securities

Exchange Act, and further involved  an accountant's opinion letter addressed to

their client which was NOT part of a marketing scheme between the client and

accountant.  In the Grassi case on the other hand, (1) only California common law

negligent misrepresentation, intentional misrepresentation and aiding and abetting

are claimed  (2) no violations of any Federal laws are claimed or even involved)

and  (3) a marketing scheme is the subject matter of  the Grassi case and  (4) the

expectations and intent of the issuer of the ratings in Plaintiffs' case are totally

different than the accountant's expectations and intent in <u>Bily</u>

1

2        **Second**: <u>Bily</u> has been subsequently distinguished by 2 cases:

3

4        (1)  In <u>Nutmeg Sec. v. McGladrey & Pullen</u>, 92 Cal. App. 4th 1435 (Cal. App. 2nd

5   Dist. 2001) the Court distinguished <u>Bily</u> and stated:

6        "I.  Standard of Review

7
   <sup>CA(I)</sup>**(1)** We note at the outset a well-established rule. <sup>HN2</sup>When a demurrer to a complaint is
8   sustained without leave to amend the complaint is reviewed de novo to determine whether,
   liberally construed, it states a cause of action under any conceivable theory, or could be
9   amended to do so. <sup>14</sup> As we shall explain below, the **[\*\*\*10]**  trial court erred in sustaining the
   demurrer to Nutmeg's complaint for three independent reasons.  **[\*\*662]**  First, Nutmeg's
10  <u>complaint falls outside Bily's "intended reliance" limitation on liability for independent audits,</u>
   <sup>15</sup> <u>because it alleges McGladrey was more than an independent auditor. In essence, the</u>
11  <u>complaint alleges McGladrey knowingly assisted AmDiv in preparing false or misleading</u>
   <u>financial reports and then, in an audit of the reports it had prepared, certified those reports as</u>
12  <u>fairly representing the company's financial position.</u> Second, even under the "intended
   reliance" rule in *Bily*, we conclude the allegations in the complaint are sufficient to state a
13  cause of action for negligent misrepresentation. Third, the complaint falls outside the
   "intended reliance" rule because it alleges *intentional* misrepresentation on the part of
14  McGladrey. Intentional misrepresentation is not subject to the "intended reliance" rule
   applicable to negligent misrepresentation. <sup>16</sup> (emphasis added)

15

16      In the Grassi case, the rating agencies were, as in <u>Nutmeg</u>,  more than  independent

17  auditors as explained above and in the FAC and accordingly are potentially liable to plaintiffs.

18

19      (2)  In  <u>Simpson v. Specialty Retail Concepts, Inc.</u>, 908 F. Supp 323 (1995) the

20  Court  was dealing with, and denied,  a Motion for Summary Judgment filed by the

21  defendants.  The case dealt with a claim by investors in a company which had obtained

22  an outside audit of its financial condition ; the investors relied on the outside audit which

23  was in error.  The issue came down to forseeability and whether the plaintiffs were

24  legally allowed to sue the auditor, who, in turn claimed, as in the Grassi case, they were

25  not foreseeable recipients for legal protection purposes.  This court, in denying

26  defendant's motion for summary judgment,  stated,  commencing at P. 331:

27

28      "Contrary to what these courts have said, the extension of

accountant liability to protect public-market investors is not always tantamount to foreseeability. <u>For example, in this case, a reasonable fact finder could determine that DH&S conducted its audit and prepared the RIPA with *knowledge* that: (1) the RIPA would be included in SRC's 10-K and Annual Report; and (2) SRC intended potential, public-market investors to rely on that information.</u> The same fact finder could also decide that it was *foreseeable* to DH&S, *but not known*, that SRC's potential creditors would also rely on the RIPA. DH&S could therefore be held liable to public-market investors based on its knowledge, without necessarily being subject to the claims of other plaintiffs, such as SRC's creditors, who are only foreseeable. <u>The foregoing analysis establishes that [HN10]public-market investors can constitute a "class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." *Rest. (Second) of Torts* § 552, Comment h</u>. *See also id.*, Illustrations 4-7 (distinguishing knowledge **[\*\*20]** from foreseeability); *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1443 (N.D. Cal. 1990) (finding accountants potentially liable to investors under § 552(2) because they were "aware not just of 'the ever-present possibility of repetition to anyone,' but of [the corporation]'s intention to distribute the audited report to a clearly defined group—potential investors"). (emphasis added)

Note to Court: <u>Simpson</u>, decided after <u>Bily</u>, follows and sites <u>Guenther</u>!

In the Grassi case, the rating agencies knew their rating (ie comparable to a report) would be circulated to the entire investing public especially those searching for safe Investment Grade bonds. They consented to the broad risk of litigation for an obvious reason: High rating fees.

**Third**, when the Court evaluates the intent of the parties ie., what was contemplated by the rating agency for example when it applied an Investment Grade Rating to

the subject bonds, the Court will hopefully revisit the websites of the three rating agencies (computer links are set forth in Plaintiffs' First Opposition at P. 17) as well as testimony given by officers of each rating agency  and confirm that each rating agency expressly claims and admits the service they offer is for the benefit of the investor.

 (a) For example, Fitch's CEO Mr. Stephen Joynt says in his "CEO Message" at Fitch's website:

 "The role of a rating agency is to gather and analyze a variety of financial, industry, market and economic information, synthesize that information, and publish independent, credible assessments of the creditworthiness of securities and issuers, thereby providing investors with an important input into their decision making process. Note that Mr. Joynt knows his ratings reach out to investors who will use this information when making their investment decision ( in this case, of whether or not to buy a certain bond).

 (b)  As noted in Plaintiffs' First Opposition, P.39, Mr. Mc Daniel, CEO of Moody's said Moody's owed a duty to the market, when asked at the House Investigation Hearing in '08. Obviously the market includes the investors.

 (c)  At that same hearing, Mr. Sharma, CEO of S & P, testified: "Responsibility to the investors is the most critical thing for us". (See Plaintiffs' First Opposition, P. 39, which cites the House Investigation testimony). Doesn't responsibility owed to investors equate to owing a duty to investors??

Further review of the websites and financial literature readily available to the public  confirms their claim of high moral and professional standards of the rating agencies: to review (professionally, objectively, honestly, etc.) prospective bonds and affix an accurate rating reflecting the likelihood of risk to guide the investor. **THEY KNOW THEIR RATING**

**WILL REACH A HUGE CLASS OF UNKNOWN  INVESTORS (OF WHICH THE PLAINTIFFS ARE INCLUDED) BECAUSE THAT IS THE SOLE PURPOSE OF THE RATINGS!**  This IS the marketing scheme they set up with their client.

Their responsibility goes further, especially as the rating agencies are regulated by the SEC: they have a duty to serve the public through objective and honest ratings. One doubts that the rating companies will dispute this point in Court on July 9th, 2010.   <u>It is not plaintiffs' fault that they are members of a large  class; the class has been defined by the defendants by virtue of their marketing scheme targeting plaintiffs' class by the rating agencies and their issuer client</u> . How can the rating agencies now come to court and complain about the size of the class defined by the marketing plan that they themselves created?

Plaintiffs have alleged and will prove the relationship between each of the defendants and Lehman Brothers: the defendants knew from the beginning that their ratings would be published to a large class…of potential investors looking for safe Investment Grade bonds. This was their targeted class.

Finally, and before we discuss <u>Guenther</u>, <u>Anderson</u>, and the <u>Restatement</u>, we should note what Bily tells us about **third party intended beneficiaries**:

<sup>C   A(6a)</sup>**(6a)"** There is, however, a further narrow class of persons who, although not clients, may reasonably come to receive and rely on an audit report and  **[*407]**  whose existence <u>constitutes a risk of audit reporting that may fairly be imposed on the auditor. Such persons are specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report.</u> **While such persons may not recover on a general negligence theory, we hold they may, for the reasons stated in part IV(B) _post_, recover on a theory of negligent misrepresentation.** "   ( Emphasis added)

Plaintiffs challenge defendants to come to Court and claim that investors like the Grassis

were not intended beneficiaries of the ratings.  The law does not require the rating agencies to

specifically  know the Grassis, just that they were aware of this group, of which the Grassi

were members.  This point is also  discussed in greater detail in Plaintiffs' First Opposition, P.

30-34.

### b.  Guenther

The 9th Cir. , in a case dealing with purchasers of shares suing due to

misrepresentation and false and misleading statements by an auditor and having to

trace their shares to the offering involving their particular shares, discussed auditor

liability to the investing public and made several key observations which are

underlined:

HN14"In defining the scope  [**16]  of liability for those who negligently supply information for the guidance of others, the Restatement (Second) of Torts limits liability to loss suffered by "the person or one of a limited group of persons for whose benefit and guidance [the provider of information] intends to supply the information or knows that the recipient intends to supply it . . . ." Restatement (Second) of Torts § 552(2)(a) (1977). The drafters of the Restatement elaborated on this particular provision as follows:

[*1443]  It is sufficient, . . . insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

Restatement (Second) of Torts § 552 comment h (1977).

In determining whether Peat Marwick owed a duty to plaintiffs, then, the question is whether Peat Marwick knew that CLS intended to circulate Peat  [**17]  Marwick's audited report to a limited group of persons for that group's benefit and guidance. There is no question here that Peat Marwick knew CLS intended to include Peat Marwick's audited report in a prospectus that would be circulated for the benefit and guidance of potential investors. 5 Peat Marwick argues, however, that investors are members of a potentially unlimited class and therefore do not fall within the ambit of section 522.

**FOOTNOTES**

5 Indeed, Peat Marwick specifically consented to that use of its report.

Peat Marwick's contention that potential investors constitute an unlimited class presupposes that the reference to "limited" in section 552 refers to a group's size. The adjective "limited," however, pertains not to size, but to identifiability. HN15While size is certainly one of the criteria that may be used to limit a group's membership, it is but one of many possible

restrictive criteria that can define the contours of a "limited group." Thus, it is not necessary that a group be restricted by size in order to qualify  **[\*\*18]**  as "limited" under <u>section 552</u>. <u>It is enough that providers of information know that their client intends to provide the information for the benefit and guidance of a group of people, and that the information provider understand the parameters that define the third-party group. Where a group is identifiable, accountants and other information providers are not relieved of liability merely because the group of people whom they intend to influence with their information is too large.</u>

<u>Here, Peat Marwick was aware not just of "the ever-present possibility of repetition to anyone," but of CLS's intention to distribute the audited report to a clearly defined group— potential investors. As members of that limited group, plaintiffs were owed a duty by Peat Marwick. [6]</u>  (emphasis added)

Defendants' response (in their Memorandum in Support of their first motion to dismiss) to this cited case is basically that  (1) they are protected from their claimed misconduct  and likely false ratings—for which they have been paid tens of thousands of dollars--by a fine-print disclaimer of liability for their analysis  and (2) the well-reasoned  9th Circuit opinion predates <u>Bily</u> and somehow the 9th Cir. misinterpreted the <u>Restatement</u> regarding the liability of a party publishing an  opinion letter which is distributed to the public. However, in shepardizing <u>Guenther</u>, it appears not to have ever been over-ruled and in fact was favorably cited by <u>Simpson</u>, supra, and a post-<u>Bily</u> decision), and the <u>Bily</u> decision makes no mention nor disapproves of <u>Guenther</u>. Could it be that <u>Guenther</u> is still good law and the 9th Circuit's analysis of the <u>Restatement</u> is still good law?!

Concerning Defendants' disclaimer argument, please see Plaintiffs' First Opposition, P. 29-30 as well as the discussion of disclaimers by the Court in Abu Dhabi discussed below.

### c.  Restatement 552

The issue is how to interpret  a provision of the <u>Restatement</u>, Sec. 552 (2)(a) which may or may not limit culpability for a published misrepresentation to …a person or limited group of persons for whose benefit and guidance the misrepresentation was made in the first place. (Note: for purposes of this motion, all of the allegations of Plaintiffs' FAC  must be taken as true)  How big can this group be?  <u>Guenther</u> answers the question: it can be huge and size is no defense to the publisher of an erroneous opinion letter. Rather the analysis comes down to

the publisher's often undisclosed intent: who was he (it ) targeting? If one person, fine. If 100,000 potential bond investors, that's the publisher's problem.  No one prevented the publisher from awarding a rating with an asterisk or qualification such as: " A+ but it could be CCC.--rely on this rating which was  paid for by our client the issuer at your own risk".  No one prevented the rating agencies from purchasing insurance against future litigation over their claimed misrepresentations, paying the premiums out of the tens of thousands of dollars they were paid for each (erroneous) rating.

   Bily, Guenther, Anderson, and dozens of other cases (and not just in California)  address the issue: to what extent is Sec. 552 (2) (a) to be applied and the simple answer is: it must be decided on a case by case basis.  The more the surrounding facts show the publisher of the erroneous document had no clue of the error and no knowledge of the planned wide dissemination of the report, the less likely responsibility will attach. Conversely, where the totality of facts show the publisher was (1) either negligent in not seeing the errors in the client's financial statements or (2)  saw them but ignored them, and willfully published the report anyway, and did so by  targeting a group of investors of  a specific type  (such as those seeking Investment Grade corporate bonds), then the cases cited above and others would extend liability.

## d. Anderson

One further case should be discussed here, cited by defendants, but which supports plaintiffs' case on several issues: Anderson v. Deloitte & Touche, LLP, 56 Cal. App. 4th 1468 (1st Dist., 1997).  This case dealt with a defendant trying to raise money for 4 wine partnerships where the Deloitte firm was hired to examine the financial records of the entity and issue an opinion concerning the accuracy of said financial records.  The Court ruled the investors could sue Deloitte even though Deloitte claimed it had not written the report for the

benefit of these particular defendants. The Court, in denying the defendants' motion for

summary judgment had several note-worthy points to make:

1.   *CA(4)***(4)** "[T]he **[***12]**  broad statements that 'scienter' is an
element of every cause of action for deceit, and that an 'intent
to deceive' is essential, are untrue, since neither is a requisite
of negligent misrepresentation. [Citations.]" (5 Witkin,
Summary of Cal. Law, Torts, *supra*, § 722, p. 821.) ⁴

2.   *CA(5)***(5)** "Under certain circumstances, expressions of
professional opinion are treated as representations of fact.
*HN6*When a statement, although **[***13]**  in the form of an
opinion, is 'not a casual expression of belief' but 'a deliberate
affirmation of the matters stated,' it may be regarded as a
positive assertion  **[*1477]** of fact. [Citation.] Moreover,
when a party possesses or holds itself out as possessing
superior knowledge or special information or expertise
regarding the subject matter and a plaintiff is so situated that it
may reasonably rely on such supposed knowledge, information,
or expertise, the defendant's representation may be treated as
one of material fact. [Citations.]" (*Bily, supra,* 3 Cal. 4th at p.
408; see also *Gagne, supra,* 43 Cal. 2d at p. 489; *Cohen* v. S &
S Construction Co. (1983) 151 Cal. App. 3d 941, 946 [201 Cal.
Rptr. 173].) (Emphasis added)

This is exactly plaintiffs' point: a so-called opinion may be

treated as a fact and, if so, can be shown to be erroneous and

actionable.

3.   *CA(7)***(7)** We conclude that appellants have raised a triable issue
concerning the reliability of respondent's IAR's through Fisher's
declaration in opposition to respondent's motion for summary
judgment. *HN8*If the acts or conduct of a professional accountant
performed in preparation for an audit or representation fall
below the applicable standard of care for the profession, in that
the accountant failed to examine or acquire the necessary
information required to support the accountant's
professional **[***15]**  opinion disseminated to potential

[TITLE OF DOCUMENT]
Case No. CV-00543-JAM-DAD

investors, the opinion is made without a reasonable ground for believing it to be true. (See *Gagne, supra*, 43 Cal. 2d at pp. 488-489.) When a statement, although in the form of an opinion, constitutes " 'a deliberate affirmation of the matters stated' " (*Bily, supra*, 3 Cal. 4th at p. 408, citing *Gagne, supra*, 43 Cal. 2d at p. 489), as occurred here, "it may be regarded as a positive assertion of fact." (*Bily* at p. 408.)

The above-described scenario is exactly what happened in plaintiffs' case

*CA(8)***(8)** The next question is whether appellants presented a triable issue of whether respondent knew with substantial certainty that appellants, or the particular class of persons to which they belong, would rely on the IAR's in the course of the transaction. The answer to that inquiry requires analysis of the circumstances surrounding the preparation of the IAR's.

In *Soderberg v. McKinney* (1996) 44 Cal. App. 4th 1760 [52 Cal. Rptr. 2d 635] (*Soderberg*), plaintiff trustee was contacted by a mortgage broker to invest in a second deed of trust on residential property. Plaintiff did so in reliance on an appraisal prepared under an agreement between the appraiser and the mortgage broker. After the borrowers defaulted on the deeds of trust, plaintiff brought an action against the appraiser for negligent misrepresentation of the property's value.

*Soderberg* reversed a summary adjudication in favor of the appraiser, concluding that the appraiser's knowledge of the potential investors by name **[***17]** or specific identity was not a prerequisite to bringing the action. It was sufficient that the appraiser supplied the information for repetition to a certain group or class of persons. It further concluded the appraiser could not establish as a matter of law that he knew the appraisal would be used solely by the mortgage broker, because he knew that the particular class of persons to which plaintiff belonged--potential investors contacted by the mortgage broker--would rely on his report for their investment decisions.

1. **[**518]** This case is comparable to *Roberts* and *Soderberg*. There is ample evidence to support a finding that respondent knew its reports were not limited to Vintech's internal or

---

personal use, but were to be included in the COM's and thus communicated to potential investors in the Mazzocco and Jekel limited partnerships. The forecast and underlying assumptions to which the IAR's refer are designed for the specific purpose of attracting investors in the limited partnerships, i.e., to induce reliance, and cannot reasonably be understood to have any other purpose. (emphasis added)

Plaintiffs were known to the defendants in this case in the sense they were potential investors of the bonds the defendants rated; in fact, this was the plan and purpose behind the ratings.  Most importantly, note how the Court  takes the position that this and the other issues (such as a so-called opinion can be a statement of fact depending on the surrounding factual circumstances) raise questions of fact. Plaintiffs contend the motion to dismiss is not the proper procedural method for resolving questions of fact. Instead, discovery should be permitted and then the defendants will have the option of filing a motion for summary judgment.

## II.  RESPONSE RE: ADDITIONAL ELEMENTS CONTENTION

Defendants insist on answers to the following points to which plaintiffs respond:

1. The time of the false statements:  Cusip #52517PYH8 was issued 2/27/08 but the specific time of day is unknown ; Cusip # 5252MOCV7 was issued 1/6/04  but the specific time of day is unknown. In both cases, plaintiffs content the rating itself attached to each bond is the misrepresentation.  (This information is set forth at. P. 8 of  Plaintiffs' First Amended Complaint.)

2. Why Plaintiffs contend the ratings were false:  Plaintiffs content the

Investment Grade ratings were set too high in view of the over-valued assets

and under-valued liabilities set forth in Lehman Brothers' financial statements

available to the respective analysts at the time of rating the bonds, as well as

Lehman's excessive leverage of over 30 to 1, and, in addition, the fact that

defendants failed to downgrade Plaintiffs' bonds as the market deteriorated

between July '07  (following the collapse of  Bear Stern's 2 hedge funds) and

up to the date Lehman Brothers filed for bankruptcy in Sept. 2008.  Finally, for

now, that Lehman's was unable to solve its predicament of being unable to sell

its toxic assets after approx. Sept. 2008.   (Most but not all of this information

is set forth at P. 8-13 as well as P. 3-8 of Plaintiffs' FAC).  Plaintiffs will produce

expert testimony as to the specific over-stated assets and under-valued

liabilities at the time of trial. However this is  a motion to dismiss, not a motion

for summary judgment or a motion for a directed verdict.  And no discovery

has been permitted to Plaintiffs even though requested.  Accordingly plaintiffs

entire case need not be set forth at this time.

   However, concerning, for example,  the importance of leverage, a factor that

would overwhelmingly influence any analyst  seriously examining Lehman's

credit-worthiness: The following summary comes from Wikipedia re

Lehman's default:

"Lehman borrowed significant amounts to fund its investing in the years
leading to its bankruptcy in 2008, a process known as leveraging or
gearing. A significant portion of this investing was in housing-related
assets, making it vulnerable to a downturn in that market. One measure
of this risk-taking was its leverage ratio, a measure of the ratio of assets

to owners equity, which increased from approximately 24:1 in 2003 to 31:1 by 2007.[2] <u>While generating tremendous profits during the boom, this vulnerable position meant that just a 3-4% decline in the value of its assets would entirely eliminate its book value or equity.[3]</u> Investment banks such as Lehman were not subject to the same regulations applied to depository banks to restrict their risk-taking.[4]...(emphasis added)

In 2008, Lehman faced an unprecedented loss due to the continuing subprime mortgage crisis. Lehman's loss was apparently a result of having held on to large positions in subprime and other lower-rated mortgage tranches when securitizing the underlying mortgages. Whether Lehman did this because it was simply unable to sell the lower-rated bonds, or made a conscious decision to hold them, is unclear. In any event, huge losses accrued in lower-rated mortgage-backed securities throughout 2008. In the second fiscal quarter, Lehman reported losses of $2.8 billion and was forced to sell off $6 billion in assets.[6] In the first half of 2008 alone, Lehman stock lost 73% of its value as the credit market continued to tighten.[6] In August 2008, Lehman reported that it intended to release 6% of its work force, 1,500 people, just ahead of its third-quarter-reporting deadline in September.[6] (emphasis added)
http://en.wikipedia.org/wiki/Bankruptcy_of_Lehman_Brothers

It was this excessive leverage combined with a balance sheet

weighted down by its large position in subprime and lower-rated

mortgage tranches when it securitized the underlying mortgages that

resulted in a company whose bonds were significantly below Investment

Grade. Several commentators have concluded Lehman's was holding

these under-water assets as it could find no buyers, esp. after Bear

Sterns closed down two of its hedge-funds which caused Wall Street to

realize the days of the wild sub-prime loans was over and the under-

water securitized investments had no buyers and Lehman's was stuck.

So, why didn't the defendants' analysts note this and down-grade the '04

bond, and either not rate or rate much lower the '08 bond and in any

event, not ever downgrade the plaintiffs bonds??

    3. <u>Specific allegations that defendants knew and targeted bond investors of

which plaintiffs are members:</u>  Plaintiffs have pled in detail the relationship

between defendants and their client Lehman Brothers going back to their mutual

and financially successful and improper ratings of mortgage-backed securities

and then their follow up financial relationship with corporate bonds.  Plaintiffs

have, to the extent currently known,  alleged the marketing arrangement between

the rating  companies and Lehman's to sell near-worthless bonds labeled

Investment Grade to the targeted group of investors looking for Investment Grade

bonds. (This Information is set forth variously from Page 3-18 of FAC).

{Note to Court: (1)  Rather than re-plead here  Pages 3-18, word for word, the

Court is asked to reread, if necessary, these pages directly from Plaintiffs' FAC}

(2)  Plaintiffs concede that they do not presently know the

name of the individual analysts, IF ANY, that allegedly reviewed

(professionally, diligently, etc.) plaintiffs' bonds as the bonds are unsigned and

this information is not available on any data base available to plaintiffs.  More

than one financial commentator has warned that several rated bonds were <u>not</u>

in fact analyzed due to the extremely high volume of bonds sent to the rating

agencies and under-staffed analyst departments.

(3)  Plaintiffs are presently working with financial experts to

determine the specific reduced values of  certain assets and increased

liabilities set forth in Lehman's  financial statements in '04, '08 and  from '04

through the filing of Bankruptcy in Sept. 2008. At this stage Plaintiffs do not

believe they are required to plead the specific adjusted values of Lehman's

assets and liabilities as no discovery has been permitted.  Numerous articles in

Plaintiffs' possession attest to the misleading valuation of assets and liabilities and

suggest assets may have been overvalued by approx. 40-50%, and liabilities

undervalued similarly.   When one considers the 30 to 1 or greater leverage

employed by Lehman's and confirmed in their financial statements, one can begin

to gauge the incredibly vulnerable financial condition of Lehman's from '04

through the bankruptcy filing in '08.  Additional articles and investigations point to

missing transactions, overly valued assets and under-valued liabilities on Lehman's

financial statements which a professional analyst should have discovered.   (See for

example the Anton Valukas report issued as part of the bankruptcy investigation of

Lehman's issued on 4/20/10.

### III.  CLAIM OF MISSING FRAUD ELEMENTS

Defendants claim plaintiffs have failed to plead facts constituting fraud. Plaintiff

responds as follows:

1.  <u>That defendants did not believe in the truth of their (rating):</u>  the Defendants knew

from reviewing the financial statements of Lehman's ('04. '08 and '04-bankruptcy

filing date) or recklessly disregarded that Lehman's  assets were not  only over-valued

but in fact were un-saleable by July '07 and all of '08 until the bankruptcy filing, the

liabilities were set too low, the leverage was too high and other financial  irregularities were common knowledge on Wall Street  to the effect that Lehman's was the next bank to follow Bear Stearns' collapse. (See Plaintiffs' FAC, P. 3-8, 8-12, 14-15, 18-20)

2.  <u>That no provable facts have been pled by Plaintiffs</u>:  See plaintiffs' pleadings from Pages 3-20 (FAC).  For example, plaintiffs contend the toxic assets on Lehman's balance sheets and additional assets were over-valued and many were unsellable to any third party purchasers as most potential purchasers (ie., other investment banks) were holders of these same or similar toxic assets and over-priced real estate projects and were all trying to unload these near-worthless investments, not buy them and therefore these assets should have been marked down to true market value, possibly on the order of a 40% reduction. However, at this time, Plaintiffs contend they are not required to set out the exact marked down value until, through discovery and with the help of financial experts, they can examine the underlying so-called assets.

The Plaintiffs' position, at this early pleading stage, is that no professional analyst, who objectively and professionally examined Lehman's financial condition at the times mentioned above, could have analyzed the over-valued assets and undervalued liabilities and overly-extended leverage, and concluded the subject bonds warranted an Investment Grade rating.  Rather, Plaintiffs contend the Defendants either never reviewed any financial records in rating the subject bonds, or if they did review same, they were culpable in awarding an Investment Grade rating due to the marketing scheme they entered into with Lehman Brothers to sell worthless bonds by targeting potential bond investors using overly-high ratings. This issue involves questions of fact, not reachable by a motion to dismiss.

2.  <u>No factual allegations as to specific Lehman's securities</u>: Plaintiffs have specifically

identified their 2 bonds (see above and in FAC), and specifically cite the over-valued

investment assets and under-valued liabilities set forth in Lehman's financial

statements at the time of the ratings.  At this point in the proceeding and without any

discovery permitted, it would seem that it is sufficient to identify not just "the financial

statements" of the company being rated in general, but to further identify the specific

problem: over-valued and unsellable assets , under-stated liabilities, and the over-

leveraged investment strategy of over 30-1.

Plaintiffs, if so required, will also plead more details to the best of their actual belief

and pursuant to information and belief  (based on dozens of financial articles from the

NY Times, Washington Post, transcripts of speeches from financial experts to those in

the financial field, remarks set forth in books such as  Too Big Too Fail ,by Andrew

Sorkin (a writer for the NY Times), The Big Short by Michael Lewis (an

acknowledged expert in the financial field), A Colossal Failure of Common Sense—

The Inside Story of the Collapse of Lehman Brothers by Lawrence G. Mc Donald (a

former director of Lehman's), dozens of articles appearing in Bloomberg's (written by

writers specializing in the ratings agencies and Wall Street) and several highly

respected blogs, some of which are from former employees of the defendants or

Lehman's, as well as testimony given at the House Oversight Committee hearing on

10/22/08 –discussed in Plaintiffs' First Opposition , and the Senate Subcommittee on

Investigation of April  23, 2010 and similar sources). Once discovery is permitted,

plaintiffs will examine all the financial records specifically in defendants' possession

and can and will be more specific as to what was reviewed, IF ANYTHING, and what

should have been noted by each analyst.

## IV.  THE FIRST AMENDMENT DOES NOT PROTECT THE

**RATINGS IN THIS CASE**

**Given that all of plaintiffs' pleadings have to be treated as true for purposes of a Motion to Dismiss, The fundamental question posed is:**

Are erroneous  statements in the form of ratings issued by rating agencies (a)  that promote their independence, professionalism and honesty and (b) which ratings are issued pursuant to a marketing scheme between a bond issuer  (who is in fact paying the rating agencies for their ratings) and a rating agency targeting potential bond investors,  and(c) which ratings have the intended effect of misleading and inducing the public to purchase certain worthless bonds and playing down the high risk of default of the rated bonds… are such ratings protected by the First Amendment?

Put differently:  is false advertising which leads to financial investment losses of investors who were likely to receive and rely on this advertising from a party possessing independent knowledge and claiming to employ a professional, honest and objective analysis and expertise of bonds,  the type of misconduct our courts and society need to protect?

It may first be helpful to remind ourselves that not all speech is entitled to First Amendment protection.  For example,

1.  Statements made with knowledge that the statements are false are not protected.

2.  Statements made with a reckless disregard for whether or not the statements are true are not protected.   "Reckless disregard" requires a showing of "actual malice".  "Actual malice" requires, as in the case before the Court, that either the defendants entertained serious doubts about the creditworthiness of Lehman's at the time they awarded

---

the subject bonds Investment Grade ratings but made the ratings anyway, or that they had no reason to believe in the validity of the ratings in the first place as they had not conducted any review.

　　　3.　Statements made pursuant to a scheme to defraud investors by inducing them to purchase overly high rated bonds in an investment in a company they would not otherwise have invested in had they known the truth.

　　　We should next note that the rating agencies have been estopped several times in the recent past from raising the First Amendment as a defense:

　　1**. In re Fitch**, 330 R. 3d 104 (2n Cir. 2003): This was a case where Fitch was in possession of certain documents that were deemed relevant in a litigation between Fitch's client and plaintiffs. Fitch declined to voluntarily produce the documents citing privilege, but the Court ordered the documents produced for two reasons: (1) Fitch was found to have played a significant role in structuring the subject investment and hence was not entitled to a journalist's privilege and (2) a party claiming First Amendment protection must demonstrate its independence concerning the subject of the reporting, whereas in this case Fitch was being paid by the subject it was reporting on.

　　　In the case before the Court, plaintiffs contend (1) the 3 rating agencies participated with Lehman's in the marketing of the subject bonds carrying false ratings for profit and (2) the 3 rating agencies were being paid by Lehman's, the same company whose bonds they were rating.

　　　{Note to Court: Plaintiffs' full discussion of Fitch is set forth at Pages 22-25 of plaintiffs' First Opposition}

**2.  Abu Dhabi Commercial Bank, et al v. Morgan Stanley, et**

**al,(2009) 651 F Supp 2d 155:**  The Honorable Shira A. Scheindlin, judge of

the United States Dist. Court of New York, on Sept. 2, 2009  rejected the attempt by

the rating agencies to seek First Amendment protection, stating at P. 32-35:

### "a. The Rating Agencies

The Rating Agencies argue that plaintiffs have not pled an actionable misrepresentation because (1) the Rating Agencies are entitled to immunity under the First Amendment and (2) even if the Rating Agencies could be held liable, their ratings are nonactionable opinions. [118] ….

It is well-established that [HN22]under typical circumstances, the First Amendment protects rating agencies, subject to an "actual malice" exception, from liability arising out of their issuance of ratings and  **[\*\*37]** reports because their ratings are considered matters of public concern. [119]  **[\*176]**  However, where a rating agency has disseminated its ratings to a select group of investors rather than to the public at large, the rating agency is not afforded the same protection. [120] Here, plaintiffs have plainly alleged that the Cheyne SIV's ratings were never widely disseminated, but were provided instead in connection with a private placement to a select group of investors. [121] Thus, the Rating Agencies' First Amendment argument is rejected.

**FOOTNOTES**

**119** *See, e.g. Compuware Corp. v. Moody's Inv. Servs., Inc.,* 499 F.3d 520, 529 (6th Cir. 2007) (affirming the dismissal of claims against rating agencies brought on the basis of credit ratings on First Amendment grounds); *Jefferson County Sch. Dist. No. R-1 v. Moody's Invs. Servs., Inc.*, 175 F.3d 848, 856 (10th Cir. 1999) (same); *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) (same).

**120** *Compare Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472

U.S. 749, 761-62, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (holding that a credit report published to five subscribers did not involve a matter of public concern because it was intended for a "specific business audience")  **[\*\*38]** *and In re Nat'I Century Fin. Enters., Inc., Inv. Litig*., 580 F. Supp. 2d 630, 640 (S.D. Ohio 2008) (refusing to apply the First Amendment where Moody's ratings had been disseminated to a "select class of institutional investors") *with Compuware Corp*., 499 F.3d at 525-29 (applying the First Amendment where Moody's had rated a publicly-held corporation).

**121** See FAC P 63.

I also reject the argument that the Rating Agencies' ratings in this case are nonactionable opinions. **122** *HN23*"[A]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact." **123** For the reasons discussed below, **124** plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned to the Rated Notes were accurate and had a basis in fact. As a result, the Rating Agencies' ratings were not mere opinions but rather actionable misrepresentations….

**123** *In re IBM Corp. Sec. Litig*., 163 F.3d 102, 109 (2d Cir. 1998). *Accord Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991) (rejecting the argument that statements containing opinions or beliefs could not be a basis for  **[\*\*39]** an action for federal securities fraud).

For the same reasons, the disclaimers in the Information Memoranda that "[a] credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities," **125** are unavailing and insufficient to protect the Rating Agencies from liability for promulgating misleading ratings. **126** I conclude that plaintiffs have sufficiently alleged that the ratings issued by the Rating Agencies on the Rated Notes are actionable misstatements.

**126** *See Jefferson County Sch. Dist. No. R-1*, 175 F.3d at 856 ("[T]he

fact that Moody's article describes its evaluation as an opinion is not sufficient, standing alone, to establish that Moody's statements are protected" and that "[i]f such an opinion were shown to have materially false components, the issuer should not be shielded from liability by raising the word 'opinion' as a shibboleth")."

   {Note: (1) the court's rejection of the rating agencies contention that their ratings are opinions and therefore are not actionable and (2) the court's summary rejection of defendants' disclaimers}

3. **Hoffman v. Capital Cities/ABC Inc. et al**, 255 F 3d 1180, the Court dealt with an analogous situation involving the First Amendment, albeit different than a rating agency case. In Hoffman, the actor sued the defendant publisher for taking and the manipulating a photo of the plaintiff for commercial purposes. Once sued, the publisher claimed the protection of the First Amendment. Although the court ultimately chose to permit the First Amendment protection here, the discussion of commercial speech is relevant in this case. The Court stated, in part:

   1. "*HN2*"Commercial speech" has special meaning in the First Amendment context. Although the boundary between commercial and noncommercial speech has yet to be clearly delineated, the "core notion of commercial speech" is that it "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983) (quotations omitted). Such speech is entitled to a measure of First Amendment protection. *See, e.g., Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 183, 144 L. Ed. 2d 161, 119 S. Ct. 1923 (1999) (setting out four-part test to evaluate constitutionality of governmental regulation of "speech that is commercial in nature"). Commercial messages, however, do not receive the same level of constitutional protection as other types of protected expression. *See 44 Liquormart, Inc.*

*v. Rhode Island*, 517 U.S. 484, 498, 134 L. Ed. 2d 711, 116 S. Ct. 1495 (1996). False **[**8]**  or misleading commercial speech is not protected. *See*  **[*1185]** *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623-24, 132 L. Ed. 2d 541, 115 S. Ct. 2371 (1995) (commercial speech receives limited amount of protection compared to speech at core of First Amendment and may freely be regulated if it is misleading). When speech is properly classified as commercial, a public figure plaintiff does not have to show that the speaker acted with actual malice. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 556 (5th Cir. 2001) ("Supreme Court precedent prevents us from importing the actual-malice standard into cases involving false commercial speech.").

2. In many right of publicity cases, the question of actual malice does not arise, because the challenged use of the celebrity's identity occurs in an advertisement that" does no more that propose a commercial transaction" and is clearly commercial speech. *See, e.g., Newcombe v. Adolph Coors Co.*, 157 F.3d 686, 691 (9th Cir. 1998) (use of pitcher's image in printed beer advertisement); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 409 (9th Cir. 1996) (use of basketball star's former **[**9]**  name in television car commercial); *Waits, 978 F.2d at 1097-98* (use of imitation of singer's voice in radio snack-food commercial); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1396 (9th Cir. 1992) (as amended) (use of game-show hostess's "identity" in print advertisements for electronic products); *Midler v. Ford Motor Co.*, 849 F.2d 460, 461 (9th Cir. 1988) (use in television car commercial of "sound-alike" rendition of song singer had recorded). In all these cases, the defendant used an aspect of the celebrity's identity entirely and directly for the purpose of selling a product. Such uses do not implicate the First Amendment's protection of expressions of editorial opinion. *Cf. White, 971 F.2d at 1401* (advertisement in which "spoof" is entirely subservient to primary message to "buy" identified product not protected by First Amendment)." (Emphasis added)

Plaintiffs contend that issuing an erroneous rating as part

of a commercial venture between a rating agency and a

bond issuer for the purpose of inducing potential bond

investors to purchase worthless bonds of the issuer, as here,

constitutes commercial speech and, as such, is not entitled

to the protection of the First Amendment.

4. **Jefferson County School District v. Moody's Investor's**

**Services, Inc.** 175 F.3d 848 (10th Cir. 1999) The obvious problem

with <u>Jefferson</u> is that it accepts as an opinion what the publisher calls

it (ie an opinion). However saying a statement is an opinion does not

make it an opinion as we see from the cases set forth above. The

rating agencies issue statements that are the claimed result of their

particular expertise, where they say variously in their websites and

in other promotional literature, that they examine a bond issuer's

financial condition quite carefully, professionally, honestly,

objectively, and based not only on information available to the public

but other information available uniquely to them received directly

from their client-the issuer.  As a result of this special position, their

rating is more than just an opinion; it is a statement of their

professional opinion which was reached after a thorough

investigation, which in this case is that the subject bond has earned

a rating of, in this  case, Investment Grade.

Conversely, if a rating agency were to state, for example,  that Ford 350 engines are better-made engines than Chevy 350 engines, no one could argue that their statement is anything but an opinion and protected under the First Amendment. However that protection is lost by a company that is well known for its expert engine analysis and <u>is being paid by the manufacturer to disregard the facts and instead advertise to the public that the Ford engine is better.</u>

5. **Unelko Co. v. Ohlhausen**, 912 F 2d 1049.  Although the court ruled against a plaintiff claiming defamation, etc. the court was required to determine if certain derogatory remarks made against plaintiff's product (rain-ex) were protected by the First Amendment. The Court explained that the circumstances and the context in which the remarks were made had to be analyzed. In the <u>Unelko</u> case the court found the remarks to be an opinion due to the circumstances surrounding the remarks: the remark was made in a humorous, satirical and hyperbolic fashion clearly showing the statement was not meant to be a factual determination. Here, in the case before the Court, the rating agencies use and advertise their expertise, professionalism, unique knowledge of bonds issued pursuant to

lengthy and often hard to understand offering circulars, and

with unique inside information concerning the issuer's financial

condition.  Plaintiffs' case is the opposite of Unelko.

### 6.  County of Orange v. McGraw Hill Cos., 245 B.R. 151 (C.D. Cal. 1999, cited by defendants, was actually a summary judgment

case, where each party had previously had the opportunity to

conduct discovery. In plaintiffs' case, we have a motion to dismiss;

no discovery has been permitted. Further, plaintiffs don't necessarily

disagree with most of County of Orange, especially the following:

[HN9]Actual malice is a subjective standard: "If a false and [**17] defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail." Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 688, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989). "A 'reckless disregard' for the truth, however, requires more than a departure from reasonably prudent conduct. 'There must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of . . . probable falsity.'" Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968)). Failure to investigate before publishing, even when a reasonably prudent person would have done so, does not establish reckless disregard. Harte-Hanks, 491 U.S. at 688.

   Plaintiffs contend that the analysts, if there were ANY analysts,

failed to meet ANY standard of analysis, let alone the prudent man

standard: how could they miss all the over-valued and unsellable

assets on Lehman's books? The under-stated liabilities? The

unprecedented leverage? The dozens of articles in the Wall Street

newspapers predicting Lehman's demise, missing assets, accounting

irregularities, and unsellable assets? Maybe these analysts were out-

sourced to some foreign country and missed everything?? Further, if

defendants admit no investigation was undertaken but the bonds

were rated anyway, then some warning should have accompanied

the rating (like: "A+ but just a guess")

Defendants are reminded that the court in <u>County of Orange</u>, id,

overruled the motion to dismiss saying:

"The County has raised a genuine question of fact about whether
S&P acted in reckless disregard of truths of which it was aware when
it assigned ratings indicating to the public that the County's 1994
debt possessed "overwhelming safety characteristics." The County
also raises a triable issue about whether S&P knowingly issued false
ratings in order to protect itself from the repercussions of
downgrading issues to which it had previously given top ratings.
Finally, the County has raised a triable issue about whether S&P had
"obvious reasons to doubt the veracity of its reporting, [but]
engaged in purposeful avoidance of the truth." *Eastwood v. Nat'l
Enquirer, Inc.*, 123 F.3d 1249, 1257 (9th Cir. 1997).

This is precisely what plaintiffs are saying and this case proves that

"reckless disregard" involves questions of fact; hence the Court

should not rule as a matter of law that these ratings are protected

opinions as not all opinions are protected and the facts surrounding

the ratings are in hot dispute.

The Court is next reminded what the <u>Anderson</u> court, supra, said about opinions being treated as statements of fact:

1. *CA(5)***(5)** "Under certain circumstances, expressions of professional opinion are treated as representations of fact. *HN6*When a statement, although **[\*\*\*13]** in the form of an opinion, is 'not a casual expression of belief' but 'a deliberate affirmation of the matters stated,' it may be regarded as a positive assertion **[\*1477]** of fact. [Citation.] Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact. [Citations.]" (*Bily, supra*, 3 Cal. 4th at p. 408; see also *Gagne, supra*, 43 Cal. 2d at p. 489; *Cohen* v. S & S Construction Co. (1983) 151 Cal. App. 3d 941, 946 [201 Cal. Rptr. 173].)

2. *CA(7)***(7)** We conclude that appellants have raised a triable issue concerning the reliability of respondent's IAR's through Fisher's declaration in opposition to respondent's motion for summary judgment. *HN8*If the acts or conduct of a professional accountant performed in preparation for an audit or representation fall below the applicable standard of care for the profession, in that the accountant failed to examine or acquire the necessary information required to support the accountant's professional **[\*\*\*15]** opinion disseminated to potential investors, the opinion is made without a reasonable ground for believing it to be true. (See *Gagne, supra*, 43 Cal. 2d at pp. 488-489.) When a statement, although in the form of an opinion, constitutes " 'a deliberate affirmation of the matters stated' " (*Bily, supra*, 3 Cal. 4th at p. 408, citing *Gagne, supra*, 43 Cal. 2d at p. 489), as occurred here, "it may be regarded as a positive assertion of fact." (*Bily* at p. 408.)

Finally, and rather than repeat Plaintiffs' position with respect to the remaining cases cited by Defendants, the Court is asked to review Plaintiffs' First Opposition (P. 41-44). Although earlier cases granted great leeway to the rating agencies and their erroneous ratings, more recent cases have taken a closer look at the rating inaccuracies, the assistance being given by the rating agencies to the issuers to achieve a higher rating, the glaring conflict of interest between the rating agency and the issuer paying the rating company for the rating, and the substantial harm being done to the investing public.

## V.  AIDING AND ABETTING

Aiding and abetting is discussed in the recent Abu Dhabi case discussed above and offers the following guidance at. Page 127 :

### "F. Aiding and Abetting

[HN32]For an aiding and abetting claim to survive a motion to dismiss, a plaintiff must adequately plead the existence of a primary tort. [214] Other than the common law fraud claims pled against Morgan Stanley  and the Rating Agencies, [215] plaintiffs have failed to adequately plead any other primary violation against defendants or a non-party. Plaintiffs' claims for aiding and abetting are pled "in the alternative to each Count against [each defendant] to the extent such a claim does not proceed." [216]  **[\*\*69]** It does not appear from this language that plaintiffs are asserting an aiding and abetting common law fraud claim against BoNY because plaintiffs do not

[TITLE OF DOCUMENT]
Case No. CV-00543-JAM-DAD

allege a common law fraud claim against BoNY.

Even if plaintiffs intended to plead that BoNY aided and abetted Morgan Stanley  and the Rating Agencies in their fraud, plaintiffs' allegations fall short. [HN33]"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance  [*187]  to advance the fraud's commission.'" [217] Plaintiffs' BoNY-specific allegations are limited. Plaintiffs allege that BoNY was responsible for marking to market all of the Cheyne SIV's assets on a daily basis and delivering reports to the Rating Agencies. [218] Plaintiffs further allege that Morgan Stanley _distributed the Information Memoranda and other Selling Documents with the knowledge, participation and approval of the Rating Agencies and BoNY. [219] BoNY was compensated for ascertaining the market value of the Cheyne SIV's assets. [220]  [**70] Its compensation was derived from the market value of those assets. [221] None of these facts indicate that BoNY was actually aware that the ratings were false and misleading or that BoNY undertook substantial steps to assist Morgan Stanley  or the Rating Agencies. Assuming *arguendo* plaintiffs intended to bring an aiding and abetting claim of common law fraud against BoNY, they have failed to adequately do so. Because plaintiffs have not sufficiently pled any other primary torts against Morgan Stanley,  the Rating Agencies, BoNY, or non-parties, no aiding and abetting claims can stand. As a result, defendants' motions to dismiss plaintiffs' aiding and abetting claims are granted."

Turning to the elements of aiding and abetting, and Plaintiffs

allegations:

 (1) **The existence of a fraud**.  The fraud is described throughout

the FAC as (1) involving a marketing scheme by the rating agencies

and Lehman Brothers to market to a targeted group of potential

bond investors various worthless bonds, including those sold to

plaintiffs,  carrying an investment grade rating.  The fraud is further

described as (2)  involving rating agencies who either claimed to

have analyzed Lehman's financial condition but did not, or did so and

detected the over-valued assets or/and undervalued liabilities, as

well as the over-leveraged investment strategy of Lehman's at or

over 30-1 such that either no rating was justified or, at best, a rating

considerably below investment grade may have been justified.

Finally the fraud involves (3) the rating agencies not downgrading

the subject bonds, as part of a scheme to support Lehman's ongoing

ability to borrow funds on the open market which a downgrade

would have prevented.

 (2) **The defendant's knowledge of the fraud**: The defendant

rating agencies knew of the fraud as they either acquiesced or

participated in the creating and perpetuation of the marketing

scheme to market worthless bonds of Lehman Brothers to potential

bond investors

 (3) **That the defendant provided substantial assistance  to**

**advance the fraud's commission**.  The defendant rating agencies,

in furtherance of the above-described marketing scheme, awarded

unduly high and unjustified ratings to the bonds being marketed;

without their unjustified high ratings, the sale of the bonds would not

have been possible.  The entire scheme depended on the rating agencies' participation.

The FAC sets forth the allegations comprising the Aiding and Abetting claim in  (1) Count 3 at P. 20-21, and also (2)  through-out the FAC by virtue of plaintiffs having stated in Para. 3A that all prior allegations in the FAC were incorporated by reference.

Note to Court: No discussion of Duty is set forth regarding Counts 2 and 3 as duty is not a requirement of intentional misrepresentation and aiding and abetting. See <u>Abu Dhabi</u> and other cases cited above.

## CONCLUSION

For the foregoing reasons, the Court is requested to deny Defendants' Motion to dismiss or, if it decides to grant the motion, to do so with leave to Plaintiffs to add the additional detail and pleadings set forth above and pursuant to the proposed Second Amended Complaint attached to the declaration of Ronald Grassi.

**May 21, 2010**

Respectfully submitted,
 /s/ Ronald and Sally Grassi
Ronald and Sally Grassi, in pro per
P.O.Box 6961
Tahoe City, Calif. 96145
(530) 583-3105

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28